Dana, C. J.
The question is, whether the plea in abatement now offered can be received.
Thacher, J.
I am clearly of opinion that it cannot.
Sewall, J.
I am of the same opinion ; because it is after a plea in bar offered and filed by the Attorney-General.
Sedgwick, J.
In this case, the Attorney-General appeared in behalf of the state at Feb. term, 1802, since which there have been many general imparlances, each of which admitted the personal ability of the plaintiff in error; and I have no doubt that it is now too late to deny it. To have preserved the right of making this objection to the capacity of the plaintiff, the defendants should have had a special imparlance, which would, undoubtedly have been granted had it been asked for. I do not think that the principle contended for is necessary to preserve the essential rights of the government; and I do not think that the admission of it would be extremely inconvenient and mischievous to the security of the citizens.
Strong, J.
I am of opinion that the plea in abatement [ * 359 ] * cannot be received; it being offered after a plea in bar filed by the Attorney-General.
Dana, C. J.
I am of the same opinion. The maxim, Nullum tempus occurrit regi, does not apply; that extends only to cases where rights are concerned. The question before us relates merely to the mode of proceeding in the cause. And it would be dangerous to admit the construction contended for, in which the rights of individuals are so materially concerned.
On Thursday, the Attorney-General filed a motion to quash the writ, assigning for cause that the court below was a new-created jurisdiction, and to which a writ of error does not lie from this Court.
The Court said it was unnecessary to file the motion, because an objection to their jurisdiction, where it is apparent on the record, might be taken advantage of in any stage of the proceedings. But they permitted the motion to be filed.
Upon this the Attorney-General entered a plea, viz. “ And now, after the motion made at this term to quash the writ is filed, and the parties agreeing that the advantage proposed therein may be taken and decided in the plea that the judgment is in *269 nothing erroneous, the Attorney-General being here in Court for the commonwealth and for the said Bosson, Thayer and Thayer, [the ter-tenants] says ”—(in nullo est erratum.)
G. Blake for the plaintiff in error.
As to the first error assigned. The information does not charge any overt act; none, at least, is set forth in that plain, specific man ner which the law requires. It is true that the words of the statute are followed, but the statute gives only a general description of the several ways in which a person may be deemed to have renounced his civil and political relation to the United States, and thereby to have forfeited his estate. One * cause of [ * 360 ] forfeiture mentioned in the statute levying war, and conspiring to levy war, against the government and people, &c.; another, adhering to the king of Great Britain, his fleets and armies, enemies, &c.; giving them aid and comfort; and the information, following the act, states in the same general way that the ancestors of the plaintiff in error did levy war, &c. &c. These expressions in this statute, which was passed April 30, 1779, are very nearly the same as those in the statute of 1777, against treason. In an' indictment for treason, it would not be sufficient to take the general words of the statute, but the overt act or acts must be particularly specified and described. So in the statute against murder, the words of the statute are general; but it would not be sufficient in an indictment for murder to allege merely in general words that the prisoner had murdered, &c., but the indictment must specify the particular act, &c. A great variety of similar cases might be mentioned ; and in prosecutions so highly pénalas those upon the “absentee act,” amounting in their consequences to an attainder, the same precision is and ought to be required as in prosecutions for treason, murder, and other capital crimes.
As to the second error assigned. It does not appear by the record that notifications were issued. By the act passed December 4, 1780, in addition to the first act, the act of 1779, notifications were to be published in three of the public newspapers, thirty days previous to the sitting of the court at which the judgment was to be rendered : no such notice appears by the record to have been given : all that appears is that the court ordered notifications to oe issued. [Sedgwick, J., suggested that there was an analogy between this case and the practice of entering up judgment on default in civil actions in which cases the notice of the suit which is returned by the officer, on the writ, is never * inserted [ * 361 ] in the record of the judgment; and as this record states that notifications were ordered to be issued, he asked whether the Court here would not now presume that the notifications were made.] *270 Blake. It ought to appear by the record, or by some of the papers connected with it, that notifications did in fact issue. In the Admiralty Court, the practice is always to state that notice did issue. Suppose no mention had been made in the record of any continuance, would not the judgment be erroneous? Would this Court presume there had been a continuance when the record was silent i The court below have thought it was necessary to say the cause was continued; and there was the same necessity for them to say that notifications were issued.
As to the third error assigned. All that is there assigned for error is abandoned, excepting the allegation that it does not appear there was a trial. The judgment is founded merely on non-appearance of any person to defend, as is obvious upon inspection. The record is, “ but no person appearing to defend this suit, it is therefore considered by the court that the estate escheat,” &c. In this species of prosecution, where there was a default of appearance, it was the duty of the court to examine and decide upon the case. The act of April, 1779, sect. 3, provided for a trial by jury, who were to say whether the estate demanded, or any part of it, was forfeited, and ought to escheat by force of the act, &c., and this whether any person appeared to defend or not. The act of Dec. 4, 1780, sect. 2, provides that when no person shall appear to defend, as mentioned in the former act, judgment shall be rendered, &c., without any trial by a jury. This was intended to give the trial to the Court in lieu of the trial by jury. [ * 362 ] * As to the fourth error assigned, femes-covert are not within the statute. They are not within the letter of the act; almost all the provisions of the act are masculine; nothing is said about females, excepting where provision is made for their dower. It is admitted that there are cases where statutes will extend to females, where the expressions are similar to those used in this act. But it is manifest from the act itself that women were not intended to be included under the general description of persons mentioned.
The first sect, of the act says “ that every inhabitant and member of the state who,” &c. Upon the strict principles of law, a femecovert is not a member; has no political relation to the state any more than an alien ; upon the most rigid and illiberal construction of the words, she cannot be a member within the meaning of the statute. As to femes-covert being members of a commonwealth, see Burlem, 214. The legislature intended to exclude femes-covert and infants from the operation of the act; otherwise the word inhabitan would have been used alone, and not coupled with the word member. This construction is strengthened by the provision in the same (the *271 first) sect, of the act respecting an oath of allegiance. A feme-covert was never holden to take an oath of allegiance. The statute is highly penal; the Court therefore will not extend it beyond the express words, or obvious meaning, by an equitable construction. The preamble is a key to unlock the meaning. What says the preamble? “ Whereas every government hath a right to command the personal services of all its members, whenever the exigences of rhe state shall require it, especially in times of an impending or actual invasion, no member thereof can then withdraw himself from the jurisdiction of the government, and thereby deprive it of his personal services, without justly incurring the * forfeiture [,* 363 ] of all his property, rights and liberties holden under and derived from that constitution of government, to the support of which he hath refused to afford his aid and assistance; and whereas the king of Great Britain did cause, &c. &c., whereupon it became the indispensable duty of all the people of said states forthwith to unite in defence of their common freedom, and by arms to oppose the fleets and armies of the said king ; yet, nevertheless, divers of the members of this and of the other United States of America, evilly disposed, or regardless of their duty towards their country, did withdraw themselves, &c. &c., aiding or giving encouragement and countenance to the operations of the fleets and armies of the said king against the United States aforesaid.”
It is impossible to read the preamble to the statute without seeing the object and intention of the act. The object was not to punish, but to retain the physical force of the state, as is evident from the expression, personal services in times of actual invasion, opposing by arms, aiding the enemy, &c. How much physical force is retained by retaining married women ? What are the personal services they are to render in opposing by force an actual invasion? What aid can they give to an enemy ? So far are women from being of service in the defence of a country against the attacks of an enemy, that it is frequently thought expedient to send them out of the way, lest they impede the operations of their own party.
In construing statutes, no rule is better established than that general expressions shall be restrained by the manifest intent of the legislature to be collected from the whole act taken together.
Plowd. 205; the stat. Westmin. 2, c. 25, enacts, that in an assize, if any being named disseisor * do personally [ * 364 ] allege the exception, viz. if he shall vouch a record and fail at the day, hu shall be adjudged for a disseisor without taking the assize, &c.; yet if a feme-covert, with her husband, vouch a record in an assize, and fail, she shall not be attained as a disseisoress, *272 &c., for it was not the intent of the makers of the act to convict a feme-covert for a disseisoress by such plea, yet afterwards being received, she shall plead to the assize. 2 Inst. 414 ; feme-covert and an infant not within the statute to have corporeal punishment by imprisonment, by this plea, by vouching of a record and failing of it. So Plowd. 465; if a statute enact that whoever shall receive, &c., a felon shall suffer death; yet a feme-covert who shall receive, &c., her husband, knowing him to have committed felony, is not accessary nor a felon. So also Plowd. 57, where land is lost by the default of the husband and wife, she may have the writ of Cui in vita; although a loss by a default of the husband only is within the letter of the statute, (Westmin. 2, c. 3.) and the reason is given in Bac. Abr. Statute, I. 5, “ because as a woman is supposed to have acted under the coercion of the husband, this is within the intent of the makers of the statute.” This reason will apply to all the cases mentioned, and to all other cases in which the law excuses a feme-covert for an act done with her husband. And can it be supposed, in the case before the Court, that the legislature contemplated the case of a wife withdrawing with her husband ? It ought not to be, and surely was not intended that she should be exposed to the loss of all her property for withdrawing from the government with her husband. If he commanded it, she was bound to obey him, by a law paramount to all other laws—the law of God. [ * 365 ] Under the general error alleged, we make two further objections. (The Court here said that they wished to have stated on the record every point that was relied on, and recommended a further assignment of errors ; whereupon the counsel immediately assigned)
Additional errors, viz.:—First, That no such seisin of Anna Martin is alleged as comes within the statute.
Secondly. That judgment was rendered after one continuance, when by the statute there ought to have been two continuances' before judgment.

Blake.

As to the first point, it does not appear that Anna Martin was so seised of the estate as to make it liable to be confiscated The information alleges that William Martin was seised of the freehold during his life, and Anna Martin of the remainder in fee; or that both were seised to his use during his life with a remainder to her in fee: the substance of the allegation, as it respects her seisen, is that she had a remainder in fee. There are no words in the statute which extend to an estate in remainder.
As to the continuances. The act of April, 1.779, expressly directs two continuances where ho person shall appear at the term next after the first continuance to take upon him the defence of the suit *273 The additional act passed Dec. 4, 1780, provides for a different mode of notifying, but says nothing as to the continuances ; the necessary consequence is that the provisions of the first act respecting continuances remained precisely as before.
Solicitor-General (Davis) for the commonwealth.
As to the first error. It is stated that no offence is alleged in the information. Nothing can be assigned for error which contradicts the record. This assignment is contrary to the record ; by recurrence to which it will appear that an offence is charged, and in the very words of the law. * By the statute a [ * 366 ] variety of acts of the persons are made cause of forfeiture of the estate ; if any one of those acts is sufficiently alleged, the judgment ought to be supported ; even admitting, though we by no means do it, that it was necessary to be as particular in this prosecution as in an indictment. The act which it is insisted is sufficiently charged, is that of withdrawing out of the state ; the information is as particular, precise and definite as to the time, place and manner of this act, as would be required in an indictment, or as can be expressed by any words in our language. In proof of this the record speaks for itself.
As to the second additional error. By the 3d sect, of the act of April, 1779, upon filing the information, the court were to continue the suit to the then next term ; to order a notification to be made out by their cleric; and to cause the sheriff, his deputy, or a constable, &c., to leave an attested copy thereof at the mansion-house on the premises demanded, or, in case there be no mansion-house, thereon to post up the same in some public place, &cc., and also to cause an attested copy of such notification to be left at the last and usual place of abode of the person charged, if any he had within the state, thirty days at least before the sitting of the court to which the suit was continued. And if no person should then appear to take on him the defence of the suit, the court should further continue it to the then next term, where the same should be then tried, &c. By first sect, of the act of Dec. 1780, made in addition to the former act, it is provided -c that when any complaint shall be exhibited in any court in pursuance of the said law, the court shall order the notification to0be published in three newspapers, &c., thirty days at least before the sitting of the same court to which the suit shall be continued ; which notification, so published, shall avail to all intents * and purposes, instead of the notification [ * 367 ] being served by the sheriff, &.C., as provided in the former law.” By the second sect, of the additional act, it is enacted “ that when no person shall appear to take upon him the defence of the said suit as mentioned in the said act, that the court shall cause *274 proclamation as in said act is provided, and that then judgment shall be rendered thereon,” &c. The last act repeals the former as to the mode of giving notice, which is not denied by the counsel for the plaintiff in error; and it is contended on the other side, that it also, by necessary implication, repeals it so far as it relates to two continuances. The word then in the spinet sect, cannot be applied to any thing but the term of the court. What term of the court ? The answer is, the term of the court mentioned in the first sect, of the additional act; that term is the term of the court to which the suit had leen continued for the purpose of giving notice ; the term holden next after the term in which the complaint was entered ; as is obvious from both the acts.
As to the first additional error. It was not necessary that there should be any seisin at all; it was sufficient that the libellee had the r'ght of seisin or possession. The second sect, of the first act by express words extends to “ lands, tenements and hereditaments of every kind, of which the persons before described were seised or possessed, or were entitled to possess, hold, enjoy or demand ;” and, therefore, it was not necessary, in the information, to allege any seisin. But in this case it appears by the record that the libellees were seised (of the estate confiscated) to the use of William, Martin, for life, and to the use of Anna Martin, in fee. Several of the estates of Sir William Pepperell, of which he was not actually seised, were confiscated, and the commonwealth have [ * 368 ] been obliged to institute inquests of office against the ter tenants to revest the possession in the Commonwealth.
As to the second, error, originally assigned. It is not necessary that it should appear on the record that notifications were issued no more than in common cases of civil actions, where judgments are rendered on default, that it should appear in the record that the writ was served. By the record before the Court, it appears that notifications were ordered to issue, and that judgment was rendered. Will not the Court, here, presume that the notice was given ? Ought they not to presume it? It is stated in the record that proclamations were made agreeably to law. Could the proclamations have been made agreeably to law unless it had appeared to the court below, that notice had been given as the law, required ? The supposition is absurd, and ought not to be admitted for the purpose of reversing a judgment. Under the peculiar circumstances of this case, the original files of that term being lost, it ought to be presumed that notifications issued and were published. That the files are lost is not, it is true, apparent by the record ; but it is a fact well known to the Court, and ought to go in aid of the pre sumption. (Parsons, on the other side, here mentioned the case ol *275 John Gould vs. The Commonwealth, upon a writ of error, brought to reverse a judgment rendered on this same statute, which was decided in Essex, at November term, 1786, in which one of the errors assigned was, (in substance,) that it did not appear that any notice had been given to the said John of the pendency of the suit. This Court reversed the judgment. He said that that judgment was rendered after two continuances, and that the Court would not look out of the record, nor presume any thing, although the order of notice had been made out by the clerk, and lay on the files of the office.)
* Davis. As to the third error originally assigned. In [ * 369 ] answer to the objection made under this head, nothing further is necessary than to read the second act, which says expressly that “ where no person appears to defend, judgment shall be rendered without any trial by a verdict of a jury, which shall avail to all intents and purposes as though the estates alleged to be forfeited were so found by the verdict of a jury.”
As to the fourth original error. It is contended by the counsel for the plaintiff in error, that the statute does not extend to femescovert, that women are not named, are not mentioned in the statute. The first sect, says, every inhabitant and member. Anna Martin was an inhabitant, and appears by the record to have been so. She is therefore within the statute. The third sect, says, any person: this is certainly sufficiently comprehensive to include all persons who could commit any of the offences mentioned in the act. The question then is, whether a feme-covert is capable of committing the offences, or any one of the offences, specified in the statute. For if a feme-covert could commit any one of the offences mentioned, and that offence be well laid in the information, the judgment ought to be affirmed. That a feme-covert could perform one, at least, of the acts described, that of withdrawing herself from the state into parts and places under the dominion of the king of Great Britain, &c., is proved by the seventh sect., which provides, “ that when the wife or widow of any of the persons aforedescribed shall have remained within the jurisdiction of any of the said United States, &c., she shall be entitled to the improvement and income of one third part of her husband’s real and personal estate, after payment of debts, during her life and continuance within the said United States; and her dower therein shall be set off to her by the judge of probate in like * manner as it might have been if her [ * 370 ] husband had died intestate, within the jurisdiction of this state.” The exception proves the rule. Wives who remained here are mentioned as an exception : the statute,-therefore, embraced all persons who did not remain—who withdrew. The very supposition *276 that some persons of this description, some/emes-couer/might remain, implies that all had the power of remaining or withdrawing, as they pleased ; and if femes-covert had not been intended to be included under ihe previous general words of the statute, there could have been no necessity of making the exception in favor of those who remained behind. If this be not so, still there is another reason. Where the husband has abjured the realm, the relation is dissolved between the husband and wife. This act of the husband, William Martin, amounts to an abjuration of the realm; and the consequence is that she became sole seised. If this consequence is not liked, then they may both be considered as having abjured, which is in itself treason ; which a feme-covert can certainly commit, and by which she forfeits her estate; and this proof is sufficient to confiscate her estate for her act of treason. 1 Hawk. P. C. ch. 1, sect. 11.
(On Friday.) The Attorney-General argued in support of the judgment. Previous to his entering upon the points which he said he should make in the case, he observed that in England writs of error were limited to twenty years; but he could not learn that the statute 10 & 11 W. III. c. 14, had been adopted and practised upon here; and therefore the case before the Court was of very great importance to the commonwealth, as, possibly, a decision in this case might be the means of calling in question every judgment which had been rendered under the acts of confiscation. And even if the English statute had been adopted here, yet the courts [ * 371 ] had * deducted eight years for the time of the continuance of the revolutionary war; and he mentioned a decision in this Court in Hampshire, in an action on a bond, brought by the administrator of Murray’s estate, and a similar decision in the Circuit Court in Boston, by judges Cushing and Davis. He then said that he should make two points:
1. That the cause is coram. non judice; this Court has no jurisdiction.
2. If it have, then sufficient appears by the record to support the judgment of the Court of Common Pleas.
As to the first. There is a distinction between the Superior Court which was before, and that which has been since, the adoption of the constitution of this state. The general practice, before the constitution, was to set aside the judgments of the inferior Court of Common Pleas in the General Court. I do not mean to say that a writ of error did not lie from the Superior Court of Judicature ; but the practice was to obtain a resolve of the General Court setting, aside the judgment, making the same null and void, and directing a new trial.
*277 These observations are made as introductory to the question whether this Court can issue a writ of error to a court which rendered a judgment as an inferior court of common pleas, a court created and in existence before the adoption of the constitution. There cannot be sucli a relation between this Court and the inferior courts of common pleas as to entitle it to issue a writ of error to correct their judgments; this Court has no greater power than the old superior court of judicature. Before the revolution, the General Court usually exercised the power of setting aside the judgments oi "the inferior court, which was never, or but rarely, done by the superior court of judicature by writ of error. This Court has no authorities, no powers * except such as are ex- [ * 372 ] pressly granted by the legislature ; and no such power, as that of reversing the judgments of those ■ courts, has been granted.
In 2 Bac. Abr. tit. Error, 3, under the head, “ In what court judgment must be given in which a writ of error will lie,” and in the authorities there cited, may be found the whole learning of the law on the subject.
How and by what authority did the inferior court of common pleas proceed in this case? The authority was derived wholly from the act of April, 1779, which, to this purpose, was in nature of an act of parliament creating a new jurisdiction. The authority given was precisely as if the act had given to the judges, by name, then composing those courts, the power of determining the questions which might be brought before them under that statute. It was similar to the late statute giving to the courts of common pleas jurisdiction in criminal cases; to which a writ of error will not lie from this Court in those cases, because they are not courts of record in criminal cases. So no writ of error lies from this Court to the courts of probate, because they are not courts of common law—not courts of record. The act has nothing in it like a common law proceeding, except trial by jury ; and that was taken away by the act of Dec. 1780, previous to the institution of the process now brought before this Court by the writ of error. It was a mere commission, like a commission from the Court of Chancery to ascertain a fact. The proceedings, then, of the Court below, were not according to the course of the common law ; it did not act as, and to this purpose was not in fact, a court of record. As to the jurisdiction of a court of error, see 3 B. Com. 106, 109. No writ of error lies to a court of admiralty; admiralty courts do not, properly speaking, exercise judiciary * power; they [ * 373 J are no more than courts of inquiry ; undoubtedly they judge, but exercising judgment does not imply judicary power. The *278 Court of Exchequer to which an appeal from the Admiralty Court lies, has not judiciary power; no writ of error lies to that court. There is no instance where the proceedings are in rem that a writ of error lies. The nearest to it is replevin ; but there damages are recovered, and replevin is also a common law proceeding.
The statute does not charge any crime, but only considers the property as derelict, and points out a mode to get the avails of it into the treasury. Both the acts, the absentee and the conspirator act, as they are usually called, were made for getting hold of the property of an enemy, or property which had no owner. The statutes were a sort of declaration of war, and the measures then adopted had nothing to do with the principles of common law, but were grounded on a state of war; and the treaty of peace with Great Britain implies that all which had been confiscated, whether by or without judgment of court, should remain so; it made no distinction as to the mode in which the estates had been confiscated ; which term means no more than taking and putting into the treasury. The statute (the absentee act) was made nearly three years after the declaration of independence. This state, then being a sovereign state, declared those persons to be aliens; it drew the line of separation; it did not declare them guilty of any crime, but declared that their estates, having no owner, should escheat. Each individual had the right of deciding what part he would take in the contest, and different men of great talents and equal integrity took different sides. The act is drawn in an awkward manner ; it ought to have said, and that is the meaning, that the estates were escheats, and the words offence and offending were incorrectly [ * 374 ] * used. It must have meant a moral and not a civil offence. It was not contrapacem; it was not vi et armis; not against any statute; not against the common law; it was no offence when these persons withdrew ;• we were all the subjects of the king; independence was not then declared, till which time our commissions, &c., were in the name of the king. But the statute considered the title of the crown as being gone, and that the state succeeded to it, and these people having adhered to the king, who was at open war with us, that we had a right to declare what should be done with them and their estates. 1 Burn, L. Dict. Escheat, which cites 1 Bl. Com. 299, 2 Bl. Com. 244.
In the case which has been cited, Gould vs. The Commonwealth, the question as to the jurisdiction of this Court was not made; and it cannot therefore be considered as an authority to prove that the writ of error lies.
If all the decisions which were had during war, in the admiralty courts, prize courts, &c., are, in time of peace, liable to be reversed *279 there would be instant cause of war, and there would be no end of war.
But the plaintiff in error is not without remedy; his remedy is like the petition of right in England in the Exchequer. He may here petition the General Court, who, it is to be presumed, will do right; and if he ought to have his property, the legislature will undoubtedly restore it to him.
The case before the Court is a decree rather than a judgment; but, be it what it may, it was sufficient to transfer the estate to the government. For, secondly, if this Court have jurisdiction of the cause, sufficient appears by the record to support the judgment of the inferior court.
None of the errors assigned are sufficient to reverse the judgment.
* As to the second, the objection is, that it does not [ * 375 ] appear by the record that notifications were made. But it does appear by the record that a notification was ordered to issue, and that proclamations were made according to law. The Court, therefore, must presume that notice was given. This is one of those legal presumptions which are always made in support of judgments.
The second additional error assigned is, that there were not two continuances. The first act undoubtedly required it; but the second, the additional act, has taken away the necessity of continuing the cause more than once. By the first act, the cause was to be continued to the term next after the libel was filed; at that term, the second term, any person might appear and defend the suit. By the additional act, if no person appear to defend, as mentioned in the first act, then judgment shall be rendered. When ? The answer is, at the second term, that being the term to which the cause was to be continued for the purpose of publishing the notifications.
The first error originally assigned is, that there is no offence charged against Anna Martin. To this it is answered that if there be any offence described in the statute, there is an offence charged in the information; for it expressly states every act, matter and thing to have been done, performed, and transacted by her, mentioned in the statute as offences. But I do not contend that the information charges any offence; the statute does not make an of-fence ; it was a mere act of sovereign "power, seizing derelict property, and putting the avails of it into the treasury.
Under the fourth error originally assigned, it been contended by the counsel for the plaintiff that the statute did not extend to femes-covert. And it is said that the words of the act do not in- *280 elude them, because the words are in the masculine gen* [ * 376 ] der ; * that they are him, his, &c. The same reasoning would go to prove that the constitution of the commonwealth does not extend to women—secures them no rights, no privileges; for it has no words in the feminine gender; it would prove that-a great variety of crimes, made so by statute, could not be committed by women, because the statutes had used only the words him and his. It also said that a feme-covert is not an inhabitant and member of the state. Surely a feme-covert can be an inhabitant in every sense of the word. Who are members of the body politic ? are not all the citizens, members; infants, idiots, insane, or whatever may be their relative situations in society ? Cannot a feme-covert levy war and conspire to levy war? She certainly can comin.t treason; and if so, there is no one act mentioned in the statute which she is not capable of performing. In the case before the Court she was defaulted : this, as in common civil actions, which might be brought against a feme-covert, confesses the facts alleged.
It is said, in the error first assigned anew, that no such seisin in Anna Martin is alleged as comes within the statute. But what does the statute, what does the information say ? The statute subjects to confiscation all the property, whether the person were seisea and possessed, or entitled to be seised and possessed; the information states both, that the husband was seised to his own use for life, and to the use of his wife in fee. This is by necessary implication an allegation of her seisin of the remainder in fee, or at least it shows a right in her to the property, which is sufficient to bring the case within the statute; for all was to escheat, whether there was an actual seisin or not. But if the proceedings in this summary process are to be scanned by the strict rules of the common law, we shall feel the consequences to our sorrow. It never was [ * 377 ] intended. And laws made relative to * aliens, under such circumstances as in the case before the Court, and the proceedings had under those laws, ought to be construed and governed by different rules—such rules as will effect the manifest object of the legislature.
Parsons, in reply, said he should make two questions. 1. Does the writ of error lie ? 2. If it does, is the judgment erroneous ? And he should contend that the writ of error lies, and then should show the judgment is erroneous; because, 1. There was no legal notice of the original process. 2. There were not two continuances 3. No seisin is alleged in Anna Martin, which comes' within the statute ; and 4. The statute does not extend to femes-covert leaving fhe country with their husbands.
*281 Previous to making any observations upon the points on which he relied, he said that, to prevent any alarms or misapprehensions as to the danger of having all the judgments which had been rendered in the processes for confiscating the estates' of absentees, &c., reversed or called in question, he thought he ought to say, that the English statute limiting the time of bringing a writ of error to twenty years after the rendition of the judgment, being made in amendment of the common law, had been adopted here, and was part of our common law.
As to the first point. A writ of error lies from this Court to all courts of record of inferior jurisdiction in all cases in which such inferior court renders judgment according to the course of the common law. It is not necessary that the subject matter should be actionable at common law, nor that the mode of process should be in the common law forms; the mode of process may be specially directed by statute. For instance—¡judgments rendered in the courts of common pleas under the statute made for the support and regulation of mills; so under the act for the partition of real estate ; and also those rendered upon awards made * on a rule of reference entered into before a justice [ * 378 J of the peace; in all of which the mode of process is provided by statute, and differing from the common law process ; yet, as the judgments are rendered according to the course of the common law, they are liable to be reversed in this Court, and a writ of error lies for that purpose. In England, the Court of Chancery has an equity jurisdiction and a common law jurisdiction: the latter is in the petty-bag office: a writ of error lies to that court from the King’s Bench, because its judgments are according to the course of the common law. What is the case now before the Court ? It is an inquest of office, similar to many of the proceedings in the petty-bag office; and this Court have heretofore, decided that a writ of error lies upon these judgments.
If the Court have jurisdiction, then is the judgment erroneous.
It is, because, First, there was no legal notice. The question is, whether it shall be presumed that the court below have done right, when it was their duty to have made an entry somewhere, (either on the docket, the information, or some other of the files,) that the notification issued and was served, and when nothing of this sort appears. By the statute the Court was to order the notification to be published, &c. It was the duty of the clerk to make it out, and it was the duty of the prosecutor to see that it was published as the law directed; if all this were done, then it became the duty of the Court to cause an entry to be made that tne notice had been giver *282 There being no such entry, what ground is there for the presumption that the notice was given ? Suppose a writ of error is brought upon a judgment rendered upon a default in a common civil action, and the plaintiff in error assigns the want of notice; is this Court to presume that the court below did right merely because [ * 379 ] they * have given judgment ? Ought not the presumption to be the other way, when the adverse party will not rhow that notice was given ? If this Court would not presume that the sheriff gave notice, then surely they would not presume that the prosecutor gave notice. It is said that the files are lost, and, therefore, the Court ought to presume every thing which might have appeared on the files, in support of the judgment. Where files are in fact lost by fire and such like accidents, perhaps there ought to be relief, possibly by a legislative interference; but a simple certificate that there are no files leaves very little ground for presumption in support of a record which is apparently defective. In this case, there is not even that ground; because, on the suggestion of diminution and certiorari, there was a certificate of the clerk that the whole was here, and that they had never been out of his office. The Court is asked by the defendant to shut their eyes, and not open them.
Secondly. There were not two continuances. The process is predicated upon the defendant’s being out of the state. And the legislature, conformably to the common cases of granting two continuances in such cases, have said expressly, in the first act, that there shall be two continuances. Does the second act vary the law in that respect ? Only thirty days’ notice is to be given, previous to the second term, and that by printing in a newspaper. It cannot be pretended that this would have been a reasonable substitute for the former mode of notice, unless there were two continuances still allowed ; it would only be adding insult to injury. The second act says that the Court shall order notifications to be published, &c.; and “ when no person shall appear to take upon him the defence of the suit, as mentioned in said act, [the first act,] that the Court shall cause proclamation as in said act is provided, and that [ * 380 ] * then judgment shall be rendered,” &c. When ?' Undoubtedly after two continuances; because, by the first act, proclamations could not be made till there had been two; and the second act is express that the Court shall cause proclamations as in the first act is provided. The preamble of the second act is evidently grounded on the idea for which we contend : the two acts are in pari materia, and must be construed together, A second statute never repeals a former, except by express words or necessary implication. And the whole purview of the two statutes shows the *283 extreme indulgence of the legislature. A stranger was authorized to appear and defend, and it cannot be supposed that when the legislature was taking away the trial by jury, that it was intended to shorten the time for appearance.
Thirdly. There is no seisin alleged, in Anna Martin, which is within the statute. By the act it appears that “ a writ of habere facias possessionem was to issue in behalf of the government and people to cause them to be seised and possessed of the estate forfeited.” This shows what was the estate made liable to forfeiture. Could an inquest of office be had of remainders or reversions ? At common law, there is no escheat of incorporeal hereditaments. The statute, therefore, must have intended that the common law rules as to seisin should apply, and that the person offending should have been seised of an estate for the possession of which the writ mentioned might have issued. No such writ could issue for an incorporeal hereditament; and in this case, the seisin of Anna Martin was, at most, of an incorporeal hereditament. When a husband and wife are seised in right of the wife, he cannot, by any act, forfeit her right; he cannot by his own act forfeit any estate except such as he is seised of in his own right. Here the seisin was to the use of the husband * for his life, and of the [ * 381 J remainder to the wife in fee. The judgment, therefore, ought to have been that the lands should enure, &c., for the life of William Martin, the husband.
Fourthly. The statute does not extend to femes-covert leaving the country with their husbands. The intention of the legislature is to be collected from the whole act taken together. In another act passed on the same day, that for confiscating the estates of certain notorious conspirators against the government and liberties of the state, in which the legislature has pointed out by name the persons who are the objects of the statute, and declared that they had justly incurred the forfeiture of all their property, &c., no mention is made of their wives. Had the legislature intended to include their wives, they certainly would have been mentioned. It is impossible, by any rules of construction, to extend the statute to the wives ; for there are no general words, but each individual, whose property is by the act made liable to confiscation, is expressly named ; “and the government and people of the state are declared to be in the real and actual possession of all their estate without further inquiry, adjudication, or determination thereafter to be had.” Can it be supposed that the general words used in the absentee act, in describing the persons offending, were intended to reach femes-covert—t.o extend to the wives of persons who, to say the least of them, had certainly been guilty of no greater offences than those notoiiout *284 conspirators l The supposition is absurd. I agree with the Attorney-General that the statute does not consider those persons as having committed treason, but it is obvious that they were, considered as guilty of an offence; and although it does not precisely define the nature of the offence, yet it points out the consequences; which were to be a forfeiture of their estates. Simply [ * 382 ] * to have declared that they had become aliens would not have answered the purpose ; it was necessary further to provide for the disposition of their estates. The statute is grounded on the position that every British subject who owned lands here, and had withdrawn himself from this country to put himself under the protection of the British government, had forfeit ed his estate. Their case was distinguished from that of aliens in general- The title of the commonwealth arose under the statute, provided the process pointed out should be regularly followed, not merely because they were aliens, but because they were aliens in a particular way—because they had deserted their country. The statutes were not a war upon enemies, as such, as is said by the Attorney-General; had they been, the legislature would have extended them to all British subjects owning lauds here.
The real question is, whether the statute was intended to include persons who have, by law, no wills of their own. The statute extends to persons who have freely renounced their relation to the state.0 Infants, insane, femes-covert, all of whom the law considers as having no will, cannot act freely. Can they freely renounce ? The statute meant such, and such only, as could. Is the state entitled to the personal services of a feme-covert to defend it in war ? Can she render any ? What aid and comfort can she give to an invading enemy ? Has she the control of property ? Is she ever required to take the oath of allegiance ? As to the provision in the statute for dower, that has no relation to her property ; it is merely the donation of the state, giving to her a part of that which was absolutely its own. There was the same provision in the conspirator act. It has been said that the husband abjured the realm, and that this dissolved the marriage contract: this is a strange consequence, and one till now unheard of. [ * 383 ] * It is said that a reversal of the judgment will be the means of calling in question a great number of the decisions in the inferior courts, and that the interests of the commonwealth are so involved in the question before the Court that the case ought not to be determined by the strict rules of the common law, but by some other; or rather, as I understand it, without regard to rules. To this it may be answered, that it is of no consequence whether other cases exist resembling this or not; and that there can *285 be no patriotism in endeavoring to enable the commonwealth to hold lands, which have not been regularly confiscated, to the delrimenf of the legal and often innocent owner.
On Wednesday, the 14th day of the term, the Court delivered their opinions.
Thacher, J.
I do not think that, for either of the three first errors assigned, the judgment ought to be reversed. As to the fourth, I give no opinion. The second additional error, that which assigns the want of two continuances, is, in my opinion, well assigned. By the act of April 30th, 1779, it is expressly provided that there shall be two continuances before judgment is rendered. The additional act has prescribed a mode of notice different from that directed in the first act, and has taken away the trial by jury in those cases where no person appears to defend the suit, but has made no other alteration whatever. In every other particular, the first statute remained in full force. It appearing, then, by the record, that judgment was rendered after one continuance only, I am clearly of opinion that, for that cause, it is erroneous, and ought to be reversed.
Sedgwick, J.
The plaintiff in error alleges that he is the son and heir of Anna, the wife of William Martin, mentioned in the libei in the case; which fact is, by the pleadings, admitted. This libel is founded on an act of the legislature, passed *on the 30th day of April, 1779. The libel was [*384] made, by the then Attorney-General, (a) to the Court of Common Pleas, then denominated the Inferior Court of Common Pleas, holden in this county on the second Tuesday of July, 1781 ; from thence' it was continued to the October term of the same court in the same year, when, upon proclamations being made, as required by the statute, and no person appearing to defend against the libel, a default was entered, and judgment was rendered that the described premises escheat to the state. Before I'proceed to consider the original proceedings in this case, it' will not be improper to mention certain facts, although those facts are in the knowledge of every one.
The present United States, which had been, previously, the acknowledged colonies of Great Britain, on the 4th of July, 1776, by their representatives, declared themselves independent of the mother country, and justified themselves by certain acts of aggression and oppression which were deemed proper to be proclaimed and explained to the world. The constituents of those representatives adopted their sentiments, and undertook to assert and suppor *286 their new situation. In this new and untried assumption, the Attorney-General, with sentiments which are equally just and liberal, admits the right of each individual to consult his own conscience in deciding on the part which it was his duty to adopt. While those generous spirits who united in defending, at every risk, the liberties and independence of their country, were, in the opinion of their fellow-citizens, entitled to deserved applause, those who, from timidity, or doubt, or principles of duty and conscience, adhered to their former allegiance, were guilty of no crime for which a punishment could be justly inflicted ; and if, from such opinions and [*385] * impressions, rthey withdrew from the country, all the evils to which they could justly be subjected would be a complete dissolution of their connection with the country from which they voluntarily withdrew, and the natural consequences thereof. They could not be punished for treason, for they had never united with the new independent society. They had created no new allegiance, for it would be inconsistent with that to which they had a right to adhere. They had an election, and this was to be determined by their own opinions of interest and duty. If they chose to unite with the majority, they became subject to the laws, and were bound to obedience. If they elected to withdraw, the support of the conflict, in which we were engaged, required that they should be permitted to do nothing which would weaken our means of defence. If they did withdraw, they abandoned whatever might be made the means of the defence of the country, and, especially, such property as might aid in that defence. Roused as the public mind then was, and engaged in a contest, on the issue of which depended every thing dear and valuable in life, it is not strange that those who refused to assist in the conflict, and voluntarily abandoned their country, at a time of its utmost need, should be deemed offenders. But the crimes of which they were guilty were not punishable further than resulted inevitably from the nature of the subject: the loss of the property which they abandoned, and which, as I think I may with some degree of propriety express it, they had staked on the issue of the contest. On these principles was the law under consideration made. By the withdrawing of the proprietor, the property left behind was derelict; it might not be converted by the owner into means of offence; it might justly be seized by the community for its own defence and [*386] security. That this was the light in which the * description of persons called absentees was viewed by the legislature, is clear to my mind from the consideration that the acts for which death was to be inflicted, if performed by those from whom allegiance was due, had, in their cases, no punisnment pro *287 vided for them ; and that, on their departure from the country, for the purposes declared in the law, they were thereby debarred from becoming thereafter connected with this society. Yet, although it was admitted, by inevitable implication, that they had committed no crime for which it was intended that a punishment should, or supposed that it ought to be inflicted, it is most manifest from the whole purview of the laws on this subject, that they were far from being considered as absolutely innocent; they were contemplated as “ evilly disposed and regardless of their duty towards their country,” then invaded by an enemy endeavoring the destruction of its independence.
The act of the30th April, 1779, after a preamble of some length, in which the legislature make an exposition of their opinions as far as to them seemed necessary to justify their proceedings towards those whose conduct they afterwards define, goes on to describe the several acts for which they say, in the conclusion of the first sect., that the persons who perform those acts, respectively, “ shall be held, taken, deemed and adjudged to have freely renounced all civil and political relations to each and every of the United States, and be considered as an alien.”
The court below, to whom jurisdiction was given, have adjudged the ancestor, the mother of the plaintiff" in error, to have performed all the acts, except one, which are specified by the statute, for whim she was toibe “ deemed and considered as an alien,” and for which, by the second sect., her estate was to “ enure and accrue to the sole use and benefit ” of the state. Here we are met with * an objection, made by the Attorney-General, that in [ * 387 ' this case a writ of error does not lie. This objection is in nature of an exception to the jurisdiction of the Court; and although it comes late, yet, if well founded, it must prevail; for whenever the Court is satisfied that it has not legal authority to pro ceed, there it will certainly stop. From the manner in which this objection has been presented to us, and the grounds on which it has been argued, it will be necessary to look further back into the jurisprudence of the country than would otherwise be required. The Attorney-General, at least, doubts whether, before the revolution, writs of error lay, without particular interposition by the legislature, from the then “ Superior Court of Judicature, Court of Assize and General Jail Delivery,” (to which this Court is successor,) to the then “ inferior courts of common pleas,” which now exist with only an alteration of the name. These courts, notwithstanding the name, then were and now are superior courts of common law : proceeding according to the rules of the common law; they were and are of extensive and almost unlimited original jurisdiction *288 Yet, notwithstanding the extent of their powers, they had, as the) now have, as many sets of judges as there are counties. These judges, though as men of great consideration and respectability, yet had no'pretension to that legal knowledge which judges in the last resort ought to possess. These courts, thus constituted, had jurisdiction as extensive as the Court of Common Pleas in England. The “ Superior Court” was supreme in all questions of law. It had expressly given to it all the powers of the courts of King’s Bench, Common Pleas, and Exchequer, in England. These facts seem to prove, (and to my mind irresistibly,) that the latter court had a power to control all the errors and to rectify all the mistakes of the former; and that such power could not be effectually [*388] * exercised by means of appeal, is evident from many instances which might be put, of which the present is one. If this was not the case, there could be no rule, no law, no security of property, or, in other words, no liberty. That an intelligent people—a people high-minded and alive to a sense of their rights, who resented, even to blood, an invasion of property, and for this cause rent an empire in twain—that such a people, from the first settlement of the country, would permit such a state of things, is incredible; (a) a state of things in which there must be, from the nature of man, as many conflicting laws as there were counties; or, more properly, as I said before, no law, no rule, no security, no liberty. In addition to what I have said, I think it proper to add that, until this time, I never heard the controlling power of the Superior Court over the courts of common pleas called in question; and I have no doubt it was always exercised, upon all proper occasions, from their first institution. So, undoubtedly, was the fact. But the Attorney-General thinks (admitting what is proved) that in this case a writ of error does not lie, because, he very justly observes, a writ of error, in England, lies only from a court of common law to an inferior court of record, and in such instances only where the inferior court proceeds according to the course of the common law. It is not intended, as I presume, to suggest that if an inferior court mistakes the rights of parties, or transgresses the bounds of their authority, that there is no remedy; this would be monstrous and absurd; but that in all instances where the proceedings of the inferior court are not according to the course of the com-[*389] mon law, although the injury* is to be redressed, the remedy is not through the medium of a writ of error. *289 This distinction is, in England, a matter of substance; here, it is only a matter of form. There, the jurisprudence of the country has thrown the several subjects of it into various classes—the common law, equity, the admiralty, the ecclesiastical, &c., jurisdictions. In all, there are inferior and superior courts; in all, the errors of inferior are to be corrected by superior courts ; but in none, except in those of common law jurisdiction, by the process technically called a writ of error. On the contrary, here, there is but one court of superintending jurisdiction, and to its superintendence all those which are inferior are subjected. It will therefore readily be perceived that there is no difference, except in name, by what technical denomination of process this superintending jurisdiction exercises its authority. But I have no doubt that the proceedings complained of by this writ of error, were the proceedings of a court of record, and that they were to be had by the rules of the common law. Even in England, wherever a jurisdiction is created by act of parliament, and the court, or judge, that exercises that jurisdiction, acts as a" court or judge of record, according to the course of the common law, a writ of error lies on their judgments; but where they act in a summary method, there a writ of error lies not, but a certiorari, (a) In this case, the Court below was a court of record, and their proceedings, as directed by the statute, were according to the course of the common law. That the process by which the subject is brought before the Court, and which is adapted to the nature of it, is new, and directed by the statute, makes no difference in this respect, is evident from many instances which might be put, and among them those which were mentioned by the counsel for the * plaintiff, of partition, and the process for recovering [ * 390 J damages for overflowing lands'; in neither of which has it ever been doubted that a writ of error lies. The Court, in these cases, although the process be new, proceeds according to the course of the common law. And what completely meets this objection, and defeats it, is, the express provision of the statute, that the issue, in this case, should be tried, by a jury in the known and ordinary course of law used and approved in this state; so that, if it be true that the distinction between writs of error and other processes for correcting the proceedings of inferior courts, (a distinction merely nominal, and which will answer no purpose of substantial justice,) is to be preserved, it cannot apply in this case.
I proceed now to consider the merits of this case. Several errors have been assigned by the plaintiff; I shall consider only one, because that one decides the substantial justice of the case.
*290 By the record before us, it appears that William Martin and Anna Martin, the father and mother of the plaintiff in error, are jointly charged with the several acts which are alleged in the libel of the Attorney-General as incurring the forfeiture for which he sued ; that since the 19th day of April, 1775, they had levied war and conspired to levy war against the provinces, or colonies, or United States ', that they had adhered to the king of Great Britain, his fleets and armies, and had given to them aid and comfort; that, since that time, they had, without the permission of the legislative or executive authority of any of the United States, withdrawn themselves therefrom into parts and places under the acknowledged authority of the king of Great Britain : all these are charged as done jointly by the husband and wife; and we are called upon, by matter apparent on the record, and by one of the errors expressly assigned, to [ * 391 ] say whether *a feme-covert, for any of these acts, performed. with her husband, is within the intention of the statute; and I think that she is not. In construing statutes, the great object is to discover from the words, the subject matter, the mischiefs contemplated, and the remedies proposed, what was the true meaning and design of the legislature. In the relation of husband and wife, the law makes, in her behalf, such an allowance for the authority of the husband, and her duty of obedience, that guilt is not imputed to her for actions performed jointly by them, unless of the most heinous and aggravated nature. For instance ; the law says, whoever steals shall be punished, and yet if a wife participates in a theft with her husband she is not punishable. (1) Innumerable other instances might be given. She is exempted from punishment, not because she is not within the letter of the law, if she had sufficient will to be considered as acting voluntarily and as a moral agent, but because she is viewed in such a state of. subjec tion, and so under the control of her husband, that she acts merely as his instrument, and that no guilt is imputable to her. Compare this with the case under consideration. In a case of great political interest, in which men of great powers and equal integrity, as is said by the Attorney-General, divided; and where a feme-covert is not expressly included, shall we suppose her to be so by general words? Can we believe that a wife, for so respecting the understanding of her husband as to submit her own opinions to his, on a subject so all-important as this, should lose her own property, and forfeit the inheritance of her children ? Was she to be considered as criminal because she permitted her husband to elect his own and her place of residence ? Because she did not, in violation of her *291 marriage vows, rebel against the will of her husband ? So hard and cruel a construction against * the general [ * 392 ] and known principles of law on this subject, could be justified by none but strong and unequivocal expressions. So far is this from being the case in this statute, that it seems to me there are no words by which it can fairly be understood that such was the intention of the legislature; but the contrary. The preamble of the statute has described the persons whom it intended to bring within it. It is that member who “ withdraws himself from the ju:isdiction of the government, and thereby deprives it of the benefit of his personal services.” A wife who left the country in the company of her husband did not withdraw herself; but was, if I may so express it, withdrawn by liim. She did not deprive the government of the benefit of her personal services; she had none to render; none were exacted of her. “ The member who so withdraws, incurs,” says the preamble, “ the forfeiture of all his property, rights, and liberties, holden under and derived from that constitution of government, to the support of which he has refused to afford his aid and- assistance.” Can any one believe it was the intention of the legislature to demand of femes-covert their aid and assistance in the support of their constitution of government ? The preamble then goes on to particularize the violation of our rights by our former sovereign, and proceeds to declare that it thereupon “ became the indispensable duty of all the people of said states forthwith to unite in defence of their common freedom, and by arms to oppose the fleets and armies of the said king; yet, nevertheless, divers of the members of this, and of the other United States of America, evilly disposed, or regardless of their duty towards their country, did withdraw themselves,” &c. Now it is unquestionably true that the members here spoken of as “ evilly disposed ” are included in the people abovementioned. * What then [ * 393 ] was the duty of these evilly-disposed persons, for a violation of which they were to be cut off from the community to which they had belonged, and rendered aliens to it? It was “ to unite in defence of their common freedom, and by arms to oppose ” an invading enemy. And can it be supposed to have been the intention of the legislature to exact the performance of this duty from wives, in opposition to the will and command of their husbands? Can it be believed that a humane and just legislature ever intended that wives should be subjected to the horrid alternative of, either, on the one hand, separating from their husbands and disobeying them, or, on the other, of sacrificing their property ? It is impossible for me to suppose that such was ever their intention. The conclusion of the preamble speaks of those who withdrew as *292 thereby “ aiding or giving encouragement and countenance to ti.e operations” of the enemy. Were femes-covert, accompanying their husbands, thus considered by the legislature ? I believe not. Sc far from believing that wives are within the statute, for any acts by them done jointly with their husbands, that a fair construction of the whole act together, does, to my judgment, clearly exclude them. And I do not discern that the 7th sect., which has been cited to prove that femes-covert, for withdrawing with their husbands, were within the act, has the least-tendency to that purpose. This sect. does not contemplate those who withdrew with their husbands, but those who staid behind. The provision which it- makes for them is not from their own estates, but from those of their husbands. And I cannot perceive that any inference is to be drawn from the one case which tends to illustrate the other. On the whole I am clearly of opinion that for this error the judgment must be reversed. [ * 394 ] * I do not think it improper, before I conclude, to say something on one other subject which was mentioned by the counsel on both sides, although it is not judicially before the Court. It was stated that, should this judgment be reversed for some of the reasons assigned, for the same reasons, all the judgments of confiscation were reversible. This would make no difference in my opinions or conduct. As a judge, it is my duty to pronounce the law, regardless of the consequences. Fiat justitia mat ccelurn is a maxim by which I hope I shall always have the independence to be governed.
In this case, from considerations which will be very obvious, I am induced to declare that I have always understood that bringing writs of error was limited to twenty years; and of course that none can hereafter be brought in these cases of confiscation.
Strong, J.,
(after stating the case.) The first question is, whether the writ of error lies. It is objected that it does not, because the jurisdiction of the Court of Common Pleas, in this case, was by virtue of a particular statute, and that the court were not to proceed according to the course of the common law. It is undoubtedly true that the rule is, that the court to which a writ of error lies must be a court of record, proceeding according to the course of common lawr. But that rule does not extend to cases where the authority of the court is by statute ; if it did, a writ of error would not lie from this Court to the courts of common pleas in any case ; for here all the powers and authorities of these courts are by the several statutes defining or describing those powers and authorities.
The meaning of the rule is, that where the court is a court of record and proceeds according to the course of the common law, *293 whether the court has existed from time immemorial or is created * by statute, that a writ of error lies upon its [ * 395 ] judgments. In the present instance, the inferior court was a court of record which had long been established as such, proceeding according to the rules of the common law. Until the statute of April 30th, 1779, they had not jurisdiction of this particular class of cases, which were indeed created by that statute, and the jurisdiction thereof given to the then inferior Courts of Common Pleas; and the statute expressly says that they should execute these powers, and try these cases by a jury “ in the known and ordinary course of law used and approved in this state; ” which, if it has any meaning, must mean according to the course of the common law. The writ of error therefore lies.
Upon the question whether the estates of femes-covert were, by this statute, liable to confiscation, I am of opinion that they were not. *The act was intended to take the estates of those persons who had voluntarily withdrawn themselves from the country, and joined the fleets and armies of Great Britain, with whom we were then at war. Could a feme-covert, in any reasonable sense of the words of the act, do this ? I think not. The law considers a feme-covert as having no will; she is under the direction and control of her husband; is bound to obey his commands ; and in many cases which might be mentioned, indeed, in all cases, except perhaps treason and murder, cannot jointly with her husband act at all ; or at least so as to make herself liable to punishment. She could not even have conveyed this very estate during the cover ture; her husband could not have conveyed it so as to have bound her ; and therefore I think that she could not forfeit it by any thing which she did or could do against this statute ; and that no act of her husband could incur the forfeiture *of [ * 396 J her estate. I am clearly of opinion that the statute does not extend to femes-covert. As to the other points in the cause, 1 give no opinion ; it not being necessary for the decision of the case now before us; but, for the reasons already given, I think that the judgment of the inferior court ought to be reversed.
Dana, C. J.
The case has been so fully gone into, that I can say very little without repeating what has been already said. One objection which is made to the judgment is, that “ it does not appear by the record that notifications were published as required by the statute.” As to this point, the question is whether, j-vhen a statute requires an act to be done in the course of proceedings in a court of justice, it ought to appear by the record that the act was done, or whether this Court are to presume that all the law required was in fact done where the record says nothing respecting it. Ip *294 common cases, as well in this Court as in the Court, of Common Pleas, it is not usual to enter on the record the act of notifying the defendant ; that appears by the files in the case; but in this case the files are lost; and, therefore, we ought to presume that the notice was given.
Another objection is that “ there is no offence charged.” The libel follows the words of the statute; and one offence, certainly, is sufficiently charged—that of withdrawing to the enemy.
Another objection is, that “ there ought to have been two continuances in the inferior court before judgment was rendered This, if there were no other point, would be sufficient to reverse the judgment. Upon a fair construction of the statutes, there ought to have been two continuances. By the additional act, the mode of notifying is altered, and the trial by jury, in certain instances, taken away; but in every other particular, the first act was left in full force.
[ * 397 ] * Another objection is, that “ the statute does not extend to a feme-covert leaving the country with her husband.”' In a former stage of the cause, I gave an opinion on this point, (a) and I see no reason to alter it. The words of the statute are general; femes-covert are not named ; if the statute extends to them, it must be by implication. The statute does not charge a crime ; every person had a right to take which side he pleased, in the contest in which we were then engaged. The statute rests on another principle. It is this; that every subject held his lands mediately or immediately from the crown. Then it became a question whether all the real property in the country was not holden under the authority of the states. And it was here adopted as a principle of law that it was so holden. The consequence was, that those persons who withdrew themselves from the country, for the purposes mentioned in the statute, lost the right of holding in the manner they would have been entitled to hold if the empire had not been divided. It was not thought fit and right that they should continue to possess and enjoy their property, let the issue be what it might. The language of the statute was, Go if you please ; but if you withdraw, we will not protect your property; we will take it. This was fair, they were not to be punished as criminal; but their property was considered as abandoned; and of course that it belonged to the state. This was a consequence resulting from the division of the empire.
But it is objected by the Attorney-General, that a writ of error *295 does not lie in this case, because the proceedings of the inferior court were under a particular statute giving the jurisdiction, and in a * course different from the common law. [ * 398 ]. To this it may be answered that the jurisdiction being given by the statute makes no difference, and that nothing is varied excepting merely the form of process; but the inquiry and decision were to be had, by the positive provisions of the statute, according to the principles of the common law. It has never been doubted that judgments rendered in the Court of Common Pleas upon awards made under rules of reference entered into before a justice of the peace, were removable to this Court by writ of error; and yet the authority of the Common Pleas, in such cases, is wholly by statute. For although the form of the process, by which those cases are brought before the Court of Common Pleas, is different from the common and ordinary processes of the court, yet the proceedings and judgment of that court upon the award are the same, in all respects, as if the award had been made by referees appointed by a rule of the court. As to the consequences of reversing the judgment now before us, arguments from inconvenience have been pressed upon the Court. We are not to take that into consideration, but what the duty is which the law requires of us. We are not accountable for the consequences; the defects in the proceedings are not our fault. If the judgment is erroneous, we are bound to say so. There are, however, I believe, but a few cases similar to the present; and I think that writs of error are limited to twenty years.
On the whole, I am clearly of opinion that the judgment ought to be reversed, because there was not a second continuance ; and because femes-covert, having no will, could not incur the forfeiture; and that the statute never was intended to include them; and oblige them either to lose their property or to be guilty of a breach of the *duty, which, by the laws of their [ * 399 ] country and the law of God, they owed to their husbands.

Judgment reversed.

Sewall, J., absent; but the Chief Justice said that he perfectly concurred with the rest of the Court, on the ground that the statute did not extend to femes-covert.

 Hon. Robert Treat Paint

 The Attorney-General here interrupted the judge, and said that he was misunderstood as to what he said respecting a writ of error lying to the Court of Common Pleas ; that he only said and so meant to be understood, that writs of error were not usually brought; that the usual mode of annulling judgments was by the General Court

 2 Bac. Abr. tit. Error; and the authorities there cited.

 Post, vol. x. p. 152, Commonwealth vs. Neal & Ux.

 It is presumed this was in Nov. term, 1803, when the motion of the j General to quash the writ of error was overruled. Vide ante, p. 352.