Ann Shanks, Margaretta Shanks, Sarah P. Shanks, Grace F. Shanks, and Eliza Shanks, (Appellants' below) Plaintiffs in Error vs. Abraham Dupont and Jane his wife, Daniel Pepper and Ann Pepper, Defendants in Error.

Thomas Scott, a native of South Carolina, died in 1782, intestate, seised of land on James Island, having two daughters, Ann and Mary, both born in South Carolina before the declaration of independence. Sarah married D. P. a citizen of South Carolina, and died in 1802, entitled to one half of the estate. The British took possession of James island and Charleston in February and May 1780; and in 1781 Ann Scott married Joseph Shanks, a British officer, and at the evacuation of Charleston in 1782, she went to England with her husband, where she remained until her death in 1801. She left five children born in England. They claimed the other moiety of the real estate of Thomas Scott, in right of their mother, under the ninth article of the treaty of peace between this country and Great Britain of the 19th of November 1794. Held that they were entitled to recover and hold the same.

If Ann Scott was of age before December 1782, as she remained in South Carolina until that time, her birth and residence must be deemed to constitute her by election a citizen of South Carolina, while she remained in that state. If she was not of age then, under the circumstances of this case, she might well be deemed to hold the citizenship of her father; for children born in a country, continuing while under age in the family of the father, partake of his natural character as a citizen of that country. [245]

All British born subjects whose allegiance Great Britain has never renounced, ought, upon general principles of interpretation, to be held within the intent, as they certainly are within the words of the treaty of 1794. [250]

The capture and possession of James Island in February 1780, and of Charleston, on the 11th of May in the same year, by the British troops, was not an absolute change of the allegiance of the captured inhabitants. They owed allegiance to the conquerors during their occupation; but it was a temporary allegiance, which did not destroy, but only suspended their former allegiance. [246]

The marriage of Ann Scott with Shanks, a British officer, did not change or destroy her allegiance to the state of South Carolina, because marriage with an alien, whether friend or enemy, produces no dissolution of the native allegiance of the wife. [246]

The general doctrine is, that no person can, by any act of their own, without the consent of the government, put off their allegiance and become aliens. [246]

The subsequent removal of Ann Shanks, to England with her husband, operates as a virtual dissolution of her allegiance, and fixed her future allegiance to the British crown by the treaty of peace in 1783. [246]

The treaty of 1783 acted upon the state of things as it existed at that period. It took the actual state of things as its basis. All those, whether natives or otherwise, who then adhered to the American states, were virtually absolved from all allegiance to the British crown; all those who then adhered to the British crown were deemed and held subjects of that crown. The treaty of

[Shanks et al. *vs*. Dupont et al.]

peace was a treaty operating between states and the inhabitants thereof. [247]

The incapacities of femes covert provided by the common law, apply to their civil rights, and are for their protection and interest. But they do not reach their political rights, nor prevent their acquiring or losing a national character. These political rights do not stand upon the mere doctrines of municipal law, applicable to ordinary transactions, but stand upon the more general principles of the law of nations. [248]


THIS was a writ of error from the supreme court of appeals in law and equity, in and for the state of South Carolina.

The suit arose out of a partition of a tract of land in the state of South Carolina; the right of the plaintiffs in error to a moiety having been denied on the ground of their alienage, and their consequent incapacity to inherit the same.

The case was argued at January term 1829, by Mr Cruger and Mr Wirt for the plaintiffs in error; and by Mr Legaré for the defendants; and was held under advisement to this term.

The facts of the case are fully stated in the opinion of the court.


The counsel for the plaintiffs in error contended, that Ann Shanks, the mother of the plaintiffs in error, was a British subject, and that her title was protected by the treaty of 1794. The decree of the court of the state of South Carolina was therefore erroneous, and should have been in favour of the plaintiffs, for a moiety of the land of which Thomas Scott died seised.


The defendants in error insisted, that the decree of the state court ought to be affirmed, because Mrs Shanks was an American citizen, capable of holding by the laws of South Carolina; so that there was no interest or title in her, to which the ninth article of the treaty of 1794, by which the titles of British subjects, holding lands in this country, were saved from the disabilities of alienage, could in any wise attach.


Mr Justice STORY delivered the opinion of the Court.

This was a writ of error to the highest court of appeals in

[Shanks et al. vs. Dupont et al.]

law and equity of the state of South Carolina; brought to revise the decision of that court, in a bill or petition in equity, in which the present defendants were original plaintiffs, and the present plaintiffs were original defendants. From the record of the case it appeared that the controversy before the court respected the right to the moiety of the proceeds of a certain tract of land, which had been sold under a former decree in equity, and the proceeds of which had been brought into the registry of the court. One moiety of the proceeds had been paid over to the original plaintiffs, and the other moiety was now in controversy. The original plaintiffs claimed this moiety also upon the ground that the original defendants were aliens and incapable of taking the lands by descent from their mother, Ann Shanks, (who was admitted to have taken the moiety of the land by descent from her father Thomas Scott,) they being British born subjects.

The facts, as they were agreed by the parties, and as they appeared on the record, were as follows:

Thomas Scott the ancestor, and first purchaser, was a native of the colony of South Carolina, and died intestate, seised of the lands in dispute, in 1782. He left surviving him two daughters, Sarah and Ann, who were also born in South Carolina, before the declaration of independence.

Sarah Scott intermarried with Daniel Pepper, a citizen of South Carolina, and resided with him in that state until 1802, when she died leaving children, the present defendants in error, whose right to her share of the property is conceded.

The British took possession of James Island, on the 11th of February 1780, and Charleston surrendered to them on the 11th of May in the same year.

In 1781, Ann Scott was married to Joseph Shanks, a British officer, and at the evacuation of Charleston, in December 1782, went with him to England, where she remained until her death, in 1801. She left five children, the present plaintiffs in error, British subjects, who claimed in right of their mother, and under the ninth article of the treaty of peace between this country and Great Britain of the 19th of November 1794, a moiety of their grandfather's estate in South Carolina.

The decision of the state court was against this claim, as

not within the protection of the treaty, because Mrs Shanks was an American citizen.

The cause was argued by Cruger and Wirt, for the plaintiffs in error; and by Mr Legaré, for the defendants in error.

After the elaborate opinions expressed in the case of Inglis *vs.* The Trustees of the Sailor's Snug Harbour, ante p. 99, upon the question of alienage, growing out of the American Revolution; it is unnecessary to do more in delivering the opinion of the court in the present case, than to state, in a brief manner, the grounds on which our decision is founded.

Thomas Scott, a native of South Carolina, died in 1782, seised of the land in dispute, leaving two daughters surviving him, Sarah, the mother of the defendants in error, and Ann, the mother of the plaintiffs in error. Without question Sarah took one moiety of the land by descent; and the defendants in error, as her heirs, are entitled to it. The only question is whether Ann took the other moiety by descent; and if so, whether the plaintiffs in error are capable of taking the same by descent from her.

Ann Scott was born in South Carolina, before the American revolution; and her father adhered to the American cause, and remained and was at his death a citizen of South Carolina. There is no dispute that his daughter Ann, at the time of the revolution, and afterwards, remained in South Carolina until December 1782. Whether she was of age during this time does not appear. If she was, then her birth and residence might be deemed to constitute her by election a citizen of South Carolina. If she was not of age, then she might well be deemed under the circumstances of this case to hold the citizenship of her father; for children born in a country, continuing while under age in the family of the father, partake of his national character, as a citizen of that country. Her citizenship, then, being prima facie established, and indeed this is admitted in the pleadings, has it ever been lost; or was it lost before the death of her father, so that the estate in question was, upon the descent cast, incapable of vesting in her? Upon the facts stated, it appears to us that it was not lost; and that she was capable of taking it at the time of the descent cast.

The only facts which are brought to support the suppo-

sition, that she became an alien, before the death of her father, are; that the British captured James Island in February 1780, and Charleston in May 1780; that she was then and afterwards remained under the British dominion in virtue of the capture; that in 1781, she married Joseph Shanks, a British officer, and upon the evacuation of Charleston in December 1782, she went with her husband, a British subject, to England, and there remained until her death in 1801. Now, in the first place, the capture and possession by the British was not an absolute change of the allegiance of the captured inhabitants. They owed allegiance indeed to the conquerors during their occupation; but it was a temporary allegiance, which did not destroy, but only suspend their former allegiance. It did not annihilate their allegiance to the state of South Carolina, and make them de facto aliens. That could only be by a treaty of peace, which should cede the territory, and them with it; or by a permanent conquest, not disturbed or controverted by arms, which would lead to a like result. Neither did the marriage with Shanks produce that effect; because marriage with an alien, whether a friend or an enemy, produces no dissolution of the native allegiance of the wife. It may change her civil rights, but it does not effect her political rights or privileges. The general doctrine is, that no persons can by any act of their own, without the consent of the government, put off their allegiance, and become aliens. If it were otherwise, then a femme alien would by her marriage become, ipso facto, a citizen, and would be dowable of the estate of her husband; which are clearly contrary to law(a).

Our conclusion therefore is, that neither of these acts warrant the court in saying that Ann Shanks had ceased to be a citizen of South Carolina, at the death of her father. This is not, indeed, controverted in the allegations of the parties.

The question then is, whether her subsequent removal with her husband operated as a virtual dissolution of her allegiance, and fixed her future allegiance to the British crown

(a) See Kelly *vs.* Harrison, 2 Johns. Cas. 29. Co. Litt. 31, b. Com. Dig. Alien. C. 1. Dower, A. 2. Bacon's Abridg. Alien. Dower, A.

by the treaty of peace of 1783. Our opinion is that it did. In the first place, she was born under the allegiance of the British crown, and no act of the government of Great Britain ever absolved her from that allegiance. Her becoming a citizen of South Carolina did not, ipso facto, work any dissolution of her original allegiance, at least so far as the rights and claims of the British crown were concerned. During the war, each party claimed the allegiance of the natives of the colonies as due exclusively to itself. The American states insisted upon the allegiance of all born within the states respectively; and Great Britain asserted an equally exclusive claim. The treaty of peace of 1783 acted upon the state of things as it existed at that period. It took the actual state of things as its basis. All those, whether natives or otherwise, who then adhered to the American states, were virtually absolved from all allegiance to the British crown. All those who then adhered to the British crown, were deemed and held subjects of that crown. The treaty of peace was a treaty operating between the states on each side, and the inhabitants thereof; in the language of the seventh article, it was a firm and perpetual peace between his Britannic majesty and the said states, " and *between the subjects of the one and the citizens of the other.*" Who were then subjects or citizens, was to be decided by the state of facts. If they were originally subjects of Great Britain and then adhered to her, and were claimed by her as subjects, the treaty deemed them such. If they were originally British subjects, but then adhering to the states, the treaty deemed them citizens. Such, I think, is the natural, and indeed almost necessary meaning of the treaty; it would otherwise follow, that there would continue a double allegiance of many persons; an inconvenience which must have been foreseen, and would cause the most injurious effects to both nations.

It cannot, we think, be doubted that Mrs Shanks, being then voluntarily under British protection, and adhering to the British side, by her removal with her husband was deemed by the British government to retain her allegiance, and to be, to all intents and purposes, a British subject. It may

be said that, being sub potestate viri, she had no right to make an election; nor ought she to be bound by an act of removal under his authority or persuasion. If this were a case of a crime alleged against Mrs Shanks, in connexion with her husband, there might be force in the argument. But it must be considered, that it was at most a mere election of allegiance between two nations, each of which claimed her allegiance. The governments, and not herself, finally settled her national character. They did not treat her as capable by herself of changing or absolving her allegiance; but they virtually allowed her the benefit of her choice, by fixing her allegiance finally on the side of that party to whom she then adhered.

It does not appear to us that her situation as a feme covert disabled her from a change of allegiance. British femes covert residing here with their husbands at the time of our independence, and adhering to our side until the close of the war, have been always supposed to have become thereby American citizens, and to have been absolved from their antecedent British allegiance. The incapacities of femes covert, provided by the common law, apply to their civil rights, and are for their protection and interest. But they do not reach their political rights, nor prevent their acquiring or losing a national character. Those political rights do not stand upon the mere doctrines of municipal law, applicable to ordinary transactions, but stand upon the more general principles of the law of nations. The case of Martin *vs.* The Commonwealth, 1 Mass. Rep. 347, turned upon very different considerations. There the question was, whether a feme covert should be deemed to have forfeited her estate for an offence committed with her husband, by withdrawing from the state, &c. under the confiscation act of 1779; and it was held that she was not within the purview of the act. The same remark disposes of the case of Sewall *vs.* Lee, 9 Mass. Rep. 363, where the court expressly refused to decide whether the wife by her withdrawal with her husband became an alien. But in Kelly *vs.* Harrison, 2 Johns. Cas. 29, the reasoning of the court proceeds upon the supposition, that the wife might have acquired the same

citizenship with her husband, by withdrawing with him from the British dominions(a).

But if Mrs Shanks's citizenship was not virtually taken away by her adherence to the British at the peace of 1783, still it must be admitted that, in the view of the British government, she was, at that time, and ever afterwards to the time of her death, and indeed at all antecedent periods, a British subject. At most, then, she was liable to be considered as in that peculiar situation, in which she owed allegiance to both governments, ad utriusque fidem regis. Under such circumstances, the question arises whether she and her heirs are not within the purview of the ninth article of the treaty with Great Britain of 1794. It appears to us that they plainly are. The language of that article is, " that *British subjects* who now hold lands in the territories of the United States, and *American citizens* who now hold lands in the dominions of his majesty, shall continue to hold them according to the nature and tenure of their respective estates and titles therein, &c. &c.; and that neither they, nor their heirs or assigns shall, so far as respects the said lands, and the legal remedies incident thereto, be regarded as aliens.

Now, Mrs Shanks was at the time a *British subject*, and she then held the lands in controversy; she is therefore within the words of the treaty. Why ought she not also to be held within the spirit and intent? It is said that the treaty meant to protect the rights of British subjects, who were not also American citizens; but that is assuming the very point in controversy. If the treaty admits of two interpretations, and one is limited, and the other liberal; one which will further, and the other exclude private rights; why should not the most liberal exposition be adopted? The object of the British government must have been to protect all her subjects holding lands in America from the disability of alienage, in respect to descents and sales. The class of American loyalists could at least, in her eyes, have been in as much favour as any other; there is nothing in our public policy which is

(a) See also Bac. Abridg. Alien A.   Cro. Car. 601, 602.   4 Term Rep. 300. *Brook Abr.* Denizen, 21.   Jackson *vs.* Lunn, 3 Johns. Cas. 109.

more unfavourable to them than to other British subjects. After the peace of 1783 we had no right or interest in future confiscation; and the effect of alienage was the same in respect to us, whether the British subject was a native of Great Britain or of the colonies. This part of the stipulation then being for the benefit of British subjects who became aliens by the events of the war; there is no reason why all persons should not be embraced in it, who sustained the character of British subjects, although we might also have treated them as American citizens. The argument supposes that because we should treat them as citizens, therefore Great Britain had no right to insist upon their being British subjects within the protection of the treaty. Now, if they were in truth and in fact, upon principles of public and municipal law, British subjects, she has an equal right to require us to recognize them as such. It cannot be doubted that Mrs Shanks might have inherited any lands in England, as a British subject, and her heirs might have taken such lands by descent from her. It seems to us, then, that all British born subjects whose allegiance Great Britain has never renounced, ought, upon general principles of interpretation, to be held within the intent, as they certainly are within the words, of the treaty of 1794.

In either view of this case, and we think both are sustained by principles of public law, as well as of the common law, and by the soundest rules of interpretation applicable to treaties between independent states, the objections taken to the right of recovery of the plaintiffs cannot prevail.

Upon the whole, the judgment of the court is, that the plaintiffs in error are entitled to the moiety of the land in controversy, which came by descent to their mother, Ann Shanks, and of course to the proceeds thereof; and that the decree of the state court of appeals ought to be reversed; and the cause remanded, with directions to enter a decree in favour of the plaintiffs in error.

Mr Justice JOHNSON, dissenting.

This cause comes up from the state court of South Carolina.

[Shanks et al. *vs.* Dupont et al.]

The question is whether the plaintiffs can inherit to their mother. The objection to their inheriting is, that they are aliens, not born in allegiance to the state of South Carolina, in which the land lies. From the general disability of aliens they would-exempt themselves. 1. On the ground that their mother was a citizen born, and in that right, though born abroad, they can inherit under the statute of Edward III. 2. That if not protected by that statute, then that their mother was a British subject, and that she and her heirs are protected as to this land by the treaties of 1783 and 1794.

The material facts of their case are, that their mother and her father were natives born of the province of South Carolina, before the declaration of independence; that in 1781, while Charleston and James Island, where the land lies and she and her father resided, were in possession of the British, their mother married their father, a British officer. That the descent was cast in 1782; and in December of that year, when the town was evacuated, she went to England with her husband, and resided there until her death in 1801; in which interval the appellants were born in England.

There is no question about the right of the appellees, if the right of the appellants cannot be maintained.

The first of the grounds taken below, to wit, the statute of Edward III. was not pressed in argument here, and must be regarded as abandoned. The second requires therefore our sole attention.

Was Mrs Shanks to be regarded as a British subject, within the meaning of our treaties with Great Britain? If so, then the land which was acquired in 1782, has the peculiar incident attached to it of being inheritable by aliens, subjects of Great Britain.

Until the adoption of the federal constitution, titles to land, and the laws of allegiance, were exclusively subjects of state cognizance. Up to the time therefore when this descent was cast upon the mother, the state of South Carolina was supreme and uncontrollable on the subject now before us.

By the adoption of the constitution, the power of the states in this respect was subjected to some modification. But

although restrained in some measure from determining who cannot inherit, I consider her power still supreme in deter-. mining who can inherit.  On this subject her own laws and her own courts furnish the only rule for governing this or any other tribunal.

By an act of the state passed in 1712, the common law of Great Britian was incorporated into the jurisprudence of South Carolina.  In the year 1782, when this descent was cast, it was the law of the land; and it becomes imperative upon these appellants, after admitting that their parent was a native born citizen of South Carolina, daughter of a native born citizen of South Carolina, to show on what ground they can escape from the operation of these leading maxims of common law.  Nemo potest exvere patriam;—and proles sequitur sortem paternam.

The unyielding severity with which the courts of Great Britain have adhered to the first of these maxims in Dr Storie's case, furnished by sir Mathew Hale, and in Æneas M'Donald's case, to be found in Foster, leaves no ground of complaint for its most ordinary application in the case of descent, and its most liberal application when perpetuating a privilege.

The treaty of peace can afford no ground to the appellants, nor the construction which has extended the provisions of that treaty to the case of escheat; for the question here is not between the alien and the state, but between aliens and other individual claimants.  The words of the sixth article of the treaty of 1783 are the same as those in the preliminary treaty of 1782.  "There shall be no future confiscations made, or future prosecutions commenced against any person or persons by reason of the part which he or they may have taken in the present war."

Conceding that escheat may be comprised under confiscation; a decision between individuals claiming under no act of force imputable to the state, cannot possibly be considered under that term.

Nor will her case be aided by the following words of that article : to wit, " nor shall any person on that account (the part which he or they may have taken in the present war) suf-

fer any future loss or damage either in person, liberty, or property." The decision of the state court gives the most liberal extension possible to this provision of the treaty, since it declares that Mrs Shanks never was precluded by any act of hers from claiming this property. It never entered into the minds of that court, that the very innocent act of marrying a British officer, was to be tortured into " taking a part in the present war;" nor that following that officer to England and residing there under coverture, was to be imputed to her a cause of forfeiture.

I consider it very important to a clear view of this question, that its constituents or several members should be viewed separately.

The state court has not pretended to impugn the force of the treaty of 1794, or denied the obligation to concede every right that can be fairly and legally asserted under it; but has only adjudged that the case of the appellants is not one which on legal grounds of construction can be brought within its provision.

The words of the treaty are : " it is agreed that British subjects who now hold lands in the territories of the United States, and American citizens who now hold lands in the dominions of his majesty," shall continue to hold and transmit to their heirs, &c.

The decision of the state court which we are now reviewing, presents two propositions :

1. That Mrs Shanks was in the year 1782, when the descent was cast, and continued to be in 1794, when the treaty was ratified, a citizen of South Carolina.

2. That she was not a British subject in the sense of the treaty.

As to the first of these two propositions, I consider it as altogether set at rest by the decision itself; it is established by paramount authority ; and this court can no more say that it is not the law of South Carolina, than they could deny the validity of a statute of the state passed in 1780, declaring that to be her character, and those her privileges.

The only question, therefore, that this court can pass upon is, whether, being recognized under that character, and pos-

sessing those rights, she is still a British subject within the provisions of the treaty.

It is no sufficient answer to this question, that it cannot be denied that Mrs. Shanks was a British subject. She was so in common with the whole American people. The argument therefore proves too much, if it proves any thing; since it leads to the absurdity of supposing that Great Britain was stipulating for the protection of her enemies, and imposing on us an obligation in favour of our own citizens.

It also blends and confounds the national character of those, to separate and distinguish whom was the leading object of the treaty of 1783.

It cannot be questioned that the treaty of 1783 must have left Mrs Shanks a British subject, or the treaty of 1794 cannot aid her offspring. And the idea of British subject under the latter treaty, will be best explained by reference to its meaning in that of 1783. The two treaties are in pari materia.

The provisions of the third article show that persons who come within the description of *People of the United States,* were distinguished from subjects of Great Britain. That article stipulates for a right in the people of the United States to resort to the gulph of St Lawrence for fishing; a stipulation wholly nugatory, if not distinguishable from subjects of Great Britain.

The fifth article is more explicit in the distinction. It first contains a provision in favour of *real British subjects,* then one in favour of persons resident in districts in possession of his majesty's arms; and then stipulates that *persons of any other description* shall have liberty to go to and remain twelve months in the United States to adjust their affairs. These latter must have included the loyalists who had been banished or in any way subjected to punishment, who are explicitly distinguished from real British subjects, and thus classed, in order to avoid the question to whom their allegiance was due, or rather, because, by the same treaty, the king having renounced all claim to their allegiance, could no longer distinguish them as British subjects.

Can those any longer be denominated British subjects

whose allegiance the king of Great Britain has solemnly renounced ?

I know of no test more solemn or satisfactory than the liability to the charge of treason ; not by reason of temporary allegiance, for that is gone with change of domicil ; were those who could claim the benefit of the king's renunciation to the colonies, subject to any other than temporary allegiance, while commorant in Great Britain ? I say they were not. Their right to inherit is not a sufficient test of that liability as to other nations, for that right results from a different principle, the exemption of a British subject from being disfranchised, while free from crime.

Was Mrs Shanks an individual to whose allegiance the king had renounced his claim ?

The commencement of the revolution found us all indeed professing allegiance to the British crown, but distributed into separate communities; altogether independent of each other, and each exercising within its own limits sovereign powers, legislative, executive and judicial. We were dependent it is true upon the crown of Great Britain, but as to all the world beside, foreign and independent. It lies then at the basis of our revolution, that when we threw off our allegiance to Great Britain, every member of each body politic stood in the relation of subject to no other power than the community of which he then constituted a member. Those who owed allegiance to the king, as of his province of South Carolina, thenceforward owed allegiance to South Carolina. The courts of this country all consider this transfer of allegiance as resulting from the declaration of independence ; the British from its recognition by the treaty of peace. But as to its effect, the British courts concur in our view of it. For, in the case of Thomas vs. Acklam, 2 B. & C. 229, the language of the British court is this : " a declaration that a state shall be free, sovereign and independent, is a declaration that the people composing that state shall no longer be considered as the subjects of that sovereign by whom the declaration is made."

From the previous relations of the colonies and mother country, it is obvious that the declaration of independence

must have found many persons resident in the country besides those whose allegiance was marked by the unequivocal circumstance of birth; many native born British subjects voluntarily adhered to the Americans, and many foreigners had by settlement, pursuits or principles, devoted themselves to her cause.

Whatever questions may have arisen, as to the national character or allegiance of these; as to the case under review, which is that of a native born citizen of South Carolina, there would be no doubt. And the courts of that state have put it beyond a doubt, that the revolution transferred her allegiance to that state.

Whoever will weigh the words "real British subjects," used in the fifth article, and consider the context, can come to but one conclusion : to wit, that it must mean British subjects to whose allegiance the states make no claim. "Estates that have been confiscated belonging to real British subjects" are the words. Now it is notorious, that although, generally speaking, the objects of those confiscations were those to whose allegiance the states laid claim, yet in many instances the estates of British subjects resident in England or this country, or elsewhere, were confiscated, because they were British subjects, on the charge of adhering to the enemy. But if the right of election had ever been contemplated, why should the term *real* have been inserted. The loyalists were British subjects, and had given the most signal proofs of their election to remain such. What possible meaning can be attached to the term *real*, unless it raised a distinction to their prejudice? And historically, we know that Great Britain acknowledged their merits by making large provisions for their indemnification; because for them there was no provision made for restoring their property.

It has been argued that the British courts, in construing the treaty of peace, have recognised this right of election, and the case of Thomas *vs.* Acklam, before cited, is supposed to establish it. But a very little attention to that case will prove the contrary. It is in fact the converse of the present case. Mrs Thomas was the daughter of Mr Ludlow, an American citizen born before the revolution, and was born

in America long after the separation.  So that her alien
character was unquestionable, unless protected by the sta-
tute of Geo. II. explaining those of Anne and Edward.  The
decision of the court of king's bench is, that to bring her-
self within the provisions of the statute, her father must be
shown at her birth to have been both a *native born* and *a
subject* of Great Britain; that by the treaty of peace, the
king had renounced all claim to his allegiance, and his sub-
sequent residence in America proved his acceptance of that
renunciation.

But when did South Carolina renounce the allegiance of
Mrs. Shanks?  We have the evidence of the states having
acquired it; when did she relinquish it?  Or if it be placed
on the footing of an ordinary contract, when did South
Carolina agree to the dissolution of this contract?  Or when
did she withdraw her protection, and thus dissolve the right
to claim obedience or subjection?

It is true, the treaty of 1794 drops the word *real*, and sti-
pulates generally for British subjects and American citizens;
construing the two treaties as instruments in pari materia.
This circumstance is of little consequence; and however we
construe it, the argument holds equally good, that the treaty
could have been only meant to aid those who needed its aid,
not those who were entitled under our own laws to every
right which the treaty meant to secure; that is, those
whose alien character prevented their holding lands, unless
aided by some treaty or statute.  Mrs Shanks was not of this
character or description; her right at all times to inherit has
been recognized by paramount authority.  But it is con-
tended, that it was at her election whether to avail herself
of her birthright as a citizen of the state, or her birthright
as a subject of Great Britain.

To this there may be several answers given.  And first, the
admission of this right would make her case no better under
the construction of the treaty; for, having no need of its
protection, as has been authentically recognized by the state
decision, it cannot be supposed that she was an object con-
templated by the treaty; she was not a British subject in

the sense of those treaties, especially if the two treaties be construed on the principle of instruments in pari materia. '

Secondly, if she had the right of election, at what time did she exercise it? for she cannot claim under her election, and against her election. If she exercised it prior to her father's death, then was she an alien at his death, and could not take even a right of entry by descent, as has been distinctly recognized in Hunter *vs.* Fairfax, 7 Cranch, 619, and I think in some other cases. She then had nothing for the treaty to act upon.'

But if her election was not complete until subsequent to her father's death, then it is clearly settled, that taking the oath of allegiance to a foreign sovereign produces no forfeiture, and she still had no need of a treaty to secure her rights to land previously descended to her. If the facts be resorted to, and the court is called upon to fix the period of her transit, it would be obliged to confine itself to the act of her marrying against her allegiance. It is the only free act of her life stated upon the record, for from thence she continued sub potestate viri; and if she or her descendants were now interested in maintaining her original allegiance, we should hear it contended, and be compelled to admit, that no subsequent act of her life could be imputed to her because of her coverture; and even her marriage was probably during her infancy.

But lastly, I deny this right of election altogether, as existing in South Carolina, more especially at that time.

I had this question submitted to me on my circuit some years since, and I then leaned in favour of this right of election. But more mature reflection has satisfied me, that I then gave too much weight to natural law and the suggestions of reason and justice; in a case which ought to be disposed of upon the principles of political and positive law, and the law of nations.

That a government cannot be too liberal in extending to individuals the right of using their talents and seeking their fortunes wherever their judgments may lead them, I readily agree. There is no limit short of its own security, to which

a wise and beneficent government would restrict its liberality on this subject.   But the question now to be decided is of a very different feature ; it is not one of expediency, but of right.   It is, to what extent may the powers of government be lawfully exercised in restraining individual volition on the subject of allegiance ; and what are the rights of the individual when unaffected by positive legislation.

As the common law of Great Britain is the law of South Carolina, it would here perhaps be sufficient to state that the common law altogether denies the right of putting off allegiance.   British subjects are permitted, when not prohibited by statute (as is the case with regard to her citizens), to seek their fortunes where they please, but always subject to their natural allegiance.   And although it is not regarded as a crime to swear allegiance to a foreign state, yet their government stands uncommitted in the subject of the embarrassments in which a state of war between the governments of their natural and that of their adopted allegiance may involve the individual.   On this subject the British government acts as circumstances may dictate to her policy.   That policy is generally liberal ; and as war is the calling of many of her subjects, she has not been rigorous in punishing them even when found with arms in their hands, where there has been no desertion, and no proclamation of recall.   The right however to withdraw from their natural allegiance is universally denied by the common law.

It is true that, without any act of her own, Mrs Shanks found herself equally amenable to both governments under the application of this common law principle.   But from this only one consequence followed, which is, that so far as related to rights to be claimed or acquired, or duties to be imposed under the laws of either government, she was liable to become the victim of the will or injustice of either.

If we were called upon to settle the claims of the two governments to her allegiance, upon the general principles applicable to allegiance even as recognized by the contending governments, we should be obliged to decide that the superior claim was in South Carolina.   For, although before the revolution a subordinate state, yet it possessed every

attribute of a distinct state; and upon principles of national law, the members of a state or political entity continue members of the state notwithstanding a change of government. The relations between the body politic and its members continue the same. The individual member and the national family remain the same, and every member which made up the body, continues in the eye of other nations in his original relation to that body. Thus we see that the American government is at this day claiming indemnity of France for the acts of those who had expelled the reigning family from the throne, and occupied their place.

But it is obvious, that although the common law be the law of South Carolina, and its principles are hostile to the right of putting off our national allegiance; the constitution and legislative acts of South Carolina, when asserting her independence, must be looked into to determine whether she may not then have modified the rigour of the common law, and substituted principles of greater liberality.

South Carolina became virtually independent on the 4th of June 1775. The association adopted by her provincial congress on that day, constituted her in effect an independent body politic; and if in international affairs, the fact of exercising power be the evidence of legally possessing it, there was no want of facts to support the inference there; for officers were deposed, and at one time the most influential men in the state were banished under the powers assumed and exercised under that association. It required the indiscriminate subscription and acquiescence of all the inhabitants of the province, under pain of banishment.

Neither of the constitutions adopted in 1776 or 1778 contains any definition of allegiance, or designation of the individuals who were held bound in allegiance to the state; but the legislative acts passed under those constitutions, will sufficiently show the received opinion on which the government acted in its legislation upon this subject.

Neither the ordinance for establishing an oath of abjuration and allegiance, passed February 13, 1777, nor the act of March 28, 1778, entitled "an act to oblige every free male inhabitant of this state, above a certain age, to give

assurance of fidelity and allegiance to the same," holds out any idea of the right of election. The first requires the oath to be taken by any one to whom it is tendered, and the last requires it to be taken by every male inhabitant above sixteen, under pain of perpetual banishment.

The preamble to the latter act indeed admits that protection and allegiance are reciprocal; but the whole course of its legislation shows that the legislature understands the right of election to belong to the state alone, and an election to withdraw allegiance from the state as a crime in the individual. The eleventh, or penal clause, is very explicit on this subject. It runs thus: " that if any person refusing or neglecting to take the oath prescribed by this act, and withdrawing from this state, shall return to the same, then he shall be adjudged guilty of *treason* against this state, and shall, upon conviction thereof, suffer death as a traitor."

Now, therefore, where there is no allegiance, there can be no treason.

Since, then, the common law of England was the law of allegiance and of descents in South Carolina, when this descent was cast upon the mother, and since remained unaltered by any positive act of legislation of the only power then possessing the right to legislate on the subject; it follows that the representatives of Mrs Shanks can derive no benefit from her election; unless the right to elect is inherent and unalienable in its nature, and remains above the legislative control of society, notwithstanding the social compact.

All this doctrine I deny. I have already observed that governments cannot be too liberal in extending the right to individuals; but as to its being unalienable, or unaffected by the social compact, I consider it to be no more so than the right to hold, devise, or inherit the lands or acquisitions of an individual. The right to enjoy, transmit, and inherit the fruits of our own labour, or of that of our ancestors, stands on the same footing with the right to employ our industry wherever it can be best employed; and the obligation to obey the laws of the community on the subject of the right to emigrate, is as clearly to be inferred from the reason and

nature of things, as the obligation to use or exercise any other of our rights, powers, or faculties, in subordination to the public good. There is not a writer who treats upon the subject, who does not qualify the exercise of the right to emigrate, much more that of putting off or changing our allegiance, with so many exceptions as to time and circumstances, as plainly to show that it cannot be considered as an unalienable or even perfect right. A state of war, want of inhabitants, indispensable talents, transfer of knowledge and wealth to a rival, and various other grounds, are assigned by writers on public law, upon which a nation may lawfully and reasonably limit and restrict the exercise of individual volition in emigrating or putting off our allegiance. All this shows, that whenever an individual proposes to remove, a question of right or obligation arises between himself and the community, which must be decided on in some mode. And what other mode is there but a reference to the positive legislation or received principles of the society itself? It is therefore a subject for municipal regulation; and the security of the individual lies in exerting his influence to obtain laws which will neither expose the community unreasonably on the one hand, nor restrain one individual unjustly on the other.

Nor have we any thing to complain of in this view of the subject. It is a popular and flattering theory, that the only legitimate origin of government is in compact, and the exercise of individual will. That this is not practically true, is obvious from history; for, excepting the state of Massachusetts, and the United States, there is not perhaps on record, an instance of a government purely originating in compact. And even here, probably, not more than one third of those subjected to the government had a voice in the contract. Women, and children under an age arbitrarily assumed, are necessarily excluded from the right of assent, and yet arbitrarily subjected. If the moral government of our maker and our parents is to be deduced from gratuitous benefits bestowed on us, why may not the government that has shielded our infancy claim from us a debt of gratitude to be repaid after manhood? In the course of nature, man has need

of protection and improvement long before he is able to re-
ciprocate these benefits.   These are purchased by the sub-
mission and services of our parents; why then should not
those to whom we must be indebted for advantages so indis-
pensable to the development of our powers, be permitted, to
a certain extent, to bind us apprentice to the community from
which they have been and are to be procured ?

If it be answered that this power ought not to be extend-
ed unreasonably, or beyond the period when we are capable
of acting for ourselves; the answer is obvious,—by what rule
is the limit to be prescribed, unless by positive municipal
regulation ?

It is of importance here, that it should be held in view
that we are considering political, not moral obligations.  The
latter are universal and immutable, but the former must fre-
quently vary according to political circumstances.   It is the
doctrine of the American court, that the issue of the revo-
lutionary war settled the point, that the American states were
free and independent on the 4th of July 1776.  On that day,
Mrs Shanks was found under allegiance to the state of South
Carolina, as a natural born citizen to a community, one of
whose fundamental principles was that natural allegiance
was unalienable; and this principle was at no time relaxed
by that state, by any express provision, while it retained the
undivided control over the rights and liabilities of its citi-
zens.

But it is argued that this lady died long after the right
of passing laws of naturalization was ceded to the United
States, and the United States have in a series of laws admit-
ted foreigners to the right of citizenship, and imposed an
oath which contains an express renunciation of natural and
every other kind of allegiance.   And so of South Carolina;
she had previously passed laws to the same effect.  In
1704 she passed a law " for making aliens free of this pro-
vince," which remained in force until 1784, when it was
superseded by the act of the 26th of March, " to confer
the right of citizenship on aliens;" to which succeeded that
of the 22d of March 1786, entitled " an act to confer certain

rights and privileges on aliens, and for repealing the act therein mentioned."

In both the latter acts the oath of allegiance is required to be taken; and that oath, as prescribed by the act of the 28th of March 1778, contains an abjuration of allegiance to any other power, and particularly to the king of Great Britian.

These legislative acts, it cannot be denied, do seem to hold out the doctrine of the right to change our allegiance, and do furnish ground for insisting, that it is absurd in a government to deny to its own citizens, the right of doing that which it encourages to be done by the citizens of other states.

Most certainly it is to be regretted that congress has not long since passed some law upon the subject, containing a liberal extension of this right to individuals, and prescribing the form and circumstances under which it is to be exercised, and by which the act of expatriation shall be authenticated. A want of liberality in legislating on this subject might involve the government in inconsistency; but the question here is whether, in absence of such declaration of the public will or opinion, courts of justice are at liberty to fasten upon the government, by inference, a doctrine negatived by the common law, and which is in its nature subject to so many modifications.

I think not. Great Britain exercises the same power either by the king's patent or by legislative enactment; and permanent laws exist in that country which extend the rights of naturalization to men by classes, or by general description. Yet this implication has never been fastened upon her; nor is the doctrine of her common law less sternly adhered to, or less frequently applied, even to the utmost extent of the punishing power of her courts of justice. In practice she moderates its severities; but in this it is will and policy that gaides her, not any relaxation of the restriction upon individual rights.

There is indeed one prominent difficulty hanging over this argument which it is impossible to remove. If it proves

any thing, it proves too much; since the inference, if resulting at all, must extend to put off one's allegiance, as well to adopted citizens as to natural born citizens; and to all times and all circumstances. What then is that obligation, that allegiance worth, which may be changed an hundred times a day? or by passing over from one army to another, perhaps in the day of battle? The truth is, it leaves but a shadow of a tie to society, and converts that which is considered as one of the most sacred and solemn obligations that can be entered into, although confirmed by the sanctity of an oath, into nothing but an illusory ground of confidence between individuals and their governments.

The idea brings man back to a state of nature; at liberty to herd with whom he pleases, and connected with society only by the caprice of the moment.

Upon the whole I am of opinion, that Mrs Shanks continued, as she was born, a citizen of South Carolina; and of course unprotected by the British treaty.

I have taken a general view of the subject, although it does not appear precisely whether or not Mrs Shanks had attained an age sufficiently mature to make an election before marriage, or was ever discovert during her life, so as to be able to elect after marriage. I have reasoned on the hypothesis most favourable to her, admitting that she had made an election in authentic form. Nor have I confined myself to authority; since I wished, as far as I was instrumental, to have this question settled on principle. But it does appear to me, that in the case of Coxe vs. M'Ilvaine, this court has decided against the right of election most expressly; for if ever the exercise of will or choice might be inferred from evidence, it is hardly possible for a stronger case to be made out than that which is presented by the facts in that case.

With regard to state decisions upon this question, I would remark, that it is one so exclusively of state cognizance, that the courts of the respective states must be held to be best acquainted with their own law upon it. Though every other state in the union, therefore, should have decided differently from the state of South Carolina, their decisions could only determine their own respective law upon this subject, and

could not weaken that of South Carolina with regard to her own law of allegiance and descents. It does appear singular, that we are here called upon to overrule a decision of the courts of South Carolina, on a point on which they ought to be best informed, and to decide an individual to be a British subject, to whose allegiance the British courts have solemnly decided the king has no claim. On this point the case of Ludlow, in Thomas *vs.* Acklam, is the case of Mrs Shanks; it is impossible to distinguish them. The state of South Carolina acknowledges her right to all the benefits of allegiance; the king of Great Britain disavows all claim to her allegiance; and yet we are called upon to declare her a British subject.

I have not had opportunity for examining the decisions of all the states upon this subject, but I doubt not they will generally be found to concur in principle with the court of South Carolina, except so far as they depend upon local law. This is certainly the case in Massachusetts. The decision in the case of Palmer *vs.* Downer, does, it is true, admit the right of the election; but besides that that case is very imperfectly, and I may add unauthentically reported, it is most certainly overruled in the subsequent case of Martin *vs.* Woods.

Before I quit the cause it may be proper to notice a passage in a book recently published in this country, and which has been purchased and distributed under an act of congress; I mean Gordon's Digest. There is no knowing what degree of authority it may be supposed to acquire by this act of patronage; but if there is any weight in the argument in favour of expatriation drawn from the acts of congress on that subject, I presume the argument will at some future time be applied to the doctrines contained in this book. If so, it was rather an unhappy measure to patronise it; since we find in it a multitude of nisi prius decisions, obiter dicta, and certainly some striking misapprehensions, ranged on the same shelf with acts of congress. On the particular subject now under consideration, art. 1649, we find the following sentence: "Citizens of the United States have a right to expatriate themselves in time of war as well as in

[Shanks et al. *vs.* Dupont et al.]

time of peace, until restrained by congress;" and for this doctrine the author quotes Talbot *vs.* Jansen, 3 Dall. and the case of the Santissima Trinidada, 7 Wheat. 348; in both which cases the author has obviously mistaken the argument of counsel for the opinion of the court; for the court in both cases expressly wave expressing an opinion, as not called for by the case, since if conceded, the facts were not sufficient to sustain the defence.

The author also quotes a case from 1 Peters's C. R. which directly negatives the doctrine, and a case from 4 Hall's Law Journal, 462, which must have been quoted to sustain the opposite doctrine. It is the case of the United States *vs.* Williams, in which the chief justice of the United States presided, and in which the right of election is expressly negatived, and the individual who pleaded expatriation is convicted and punished.

This cause came on to be heard on the transcript of the record from the supreme court of appeals in law and equity in and for the state of South Carolina, and was argued by counsel; on consideration whereof, it is considered and declared by this court that Ann Shanks, the mother of the original defendants, was at the time of her death a British subject, within the true intent and meaning of the ninth article of the treaty of amity, commerce and navigation made between his Britannic majesty and the United States of America on the 19th of November 1794, and that the said original defendants, as her heirs and British subjects, are capable to take, and did take by descent from her the moiety of the land in the proceedings mentioned, and are entitled to the proceeds of the sale thereof, now in the registry of the circuit court of equity, as in the said proceedings mentioned. It is therefore considered and adjudged by this court, that there is error in the decree of the said court of appeals in equity, of the state of South Carolina, in affirming the decree of the circuit court, in said proceedings mentioned, whereby it was ordered and decreed, that the money arising from the sale of the land in question, theretofore re-

served subject to the order of the court, be paid over to the petitioners, as the only heirs who are capable of taking the same. And it is further ordered and adjudged by this court, that for this cause the decree of the circuit court aforesaid, and of the court of appeals aforesaid be, and each of them is hereby reversed. And it is further ordered and adjudged by this court, that the cause be remanded to the said court of appeals, with directions that a decree be entered therein, that the said moiety of the said proceeds of the said sale be paid over to the original defendants (the present plaintiffs in error) as their right, and that such further proceedings be had therein as to justice and equity may in the premises appertain.