---

## In re SIEM.

(District Court, D. Montana. November 27, 1922.)

No. 67.

1. **Citizens ⬡⟹3, 13—All persons are citizens or subjects of the country of their birth, and cannot change without country's consent.**

　Every person is a citizen or subject of the country of his birth, and owes allegiance to that country, unless and until his allegiance has been transferred with his country's consent.

2. **Army and navy ⬡⟹20—Aliens owe no duty of military service.**

　The obligation of military service attaches to citizenship, and no duty to render such service rests on a resident alien, though he has declared his intention to become a citizen.

3. **Army and navy ⬡⟹20—Alien may not be required to render military service.**

　An alien applicant for admission to citizenship is not required to renounce his allegiance to his native country, nor to swear allegiance to the United States, until his admission to full citizenship, and until such time his allegiance to the former country continues, and he cannot be compelled to render military service to the United States without violation of international law.

4. **Aliens ⬡⟹62—Claiming exemption from draft not a bar to admission to citizenship.**

　The fact that an alien, who had declared his intention to become a citizen, and who was a native of a country which was neutral in the late war, claimed exemption from the draft on the ground of alienage, is not evidence that he was not "attached to the principles of the Constitution," which should bar him from citizenship under Naturalization Act June 29, 1906, § 4, subd. 4 (Comp. St. § 4352).

5. **Aliens ⬡⟹62—Subjection to military service gives moral right to admission to citizenship.**

　Where the United States denied the claim of an alien declarant to exemption from the draft, and called him for service, though he was rejected for physical disability, thus subjecting him to the supreme obligation of citizenship, it is morally estopped to deny him its benefits, if otherwise eligible.

On application of Lasse A. Siem for admission to citizenship. Granted.

H. A. Tyvand, of Butte, Mont., for petitioner.

Frank G. Pugsley, Naturalization Examiner, of Seattle, Wash., for the United States.

BOURQUIN, District Judge. This petitioner for citizenship is a subject of Norway. He declared intention, registered in the draft of 1917, claimed exemption on account of (1) dependents (2) alienage, and (3) physical unfitness, was classified A 1, called, examined, and rejected as physically unfit, and worked in the copper mines throughout the war.

---

⬡⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The federal examiner or counsel cites many federal decisions supporting his contention that the claim based on alienage disqualifies petitioner for admission. Of these decisions it is enough to say the earlier are rather vague, but the later clearly proceed upon the theory that the claim manifests that the alien is not "attached to the principles of the Constitution." This is a comprehensible and valid conclusion, if sound. That it is unsound seems fairly demonstrable.

Incidentally, as the war and its emotions recede, it is interesting to note that the earliest of said decisions denied admission "with prejudice"; the later, without this futile excommunication; the latest, with express leave to renew; and now is the instant proceeding with its decision granting admission. This determination is foreshadowed by In re Norman (D. C.) 256 Fed. 543, and the justification for its dissent from practically all federal authority requires brief consideration of (1) the political status of persons and the respective obligations of citizens and aliens, and (2) the requirements of the Naturalization Act.

[1] To proceed to the first, the law of nations "is part of our law." Hilton v. Guyot, 159 U. S. 163, 16 Sup. Ct. 139, 40 L. Ed. 95. It provides that in general all persons are citizens (subjects) of the countries (governments, sovereigns) of their birth, and in consequence owe them permanent allegiance. This status cannot be changed without their countries' consent. Shanks v. Dupont, 3 Pet. 245, 7 L. Ed. 666.

A person may be admitted to citizenship in another country without his country's consent, but the only result is that thereafter he is a citizen of two countries. His allegiance and obligations to the country of his birth are not diminished, and in so far as they conflict with his new allegiance, "he becomes a citizen of the new country at his peril." Talbot v. Janson, 3 Dall. 164, 169, 1 L. Ed. 540.

[2] The distinguishing and supreme obligation of citizenship and its permanent allegiance is military service. It has its antecedent in the feudal system wherein the vassal makes oath of fealty to his lord and serves him in war, as a consideration and payment for the land and protection he receives from his lord. So the citizen born to or making oath of allegiance likewise renders military service to the country in payment of and in consideration for the advantages, rights, and protection it extends to him. As these latter are the possession of citizens, and not of aliens, the consequence is that the obligation of military service that attends them attaches only when the alien is admitted to citizenship. It cannot attach before admission. See Vattel, Law of Nations, 294; Luria v. U. S., 231 U. S. 22, 34 Sup. Ct. 10, 58 L. Ed. 101; Draft Cases, 245 U. S. 378, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856.

To render military service, any country may recall its citizens from the ends of the earth. For these reasons, without his country's consent, a person neither can be rightfully compelled to enter the military service of a country wherein he is an alien, nor can he rightfully voluntarily do so. If either wrong against his country is committed, for the first it may have just cause for war, and for the second it may pursue and punish him. Williams' Case, Fed. Cas. No. 17,708, and note; Vattel, Law of Nations, 297, 298. All that can be rightfully exacted of

an alien is the obligation of temporary allegiance due to the country wherein he is alien, viz. respect for municipal law, and civil duties of assistance and defense against calamities and robbers, pirates, and other evil persons who are enemies of no country in particular, but of society in general. Vattel, Law of Nations, 173. In respect to change of citizenship and allegiance, all leading countries, including this country and Norway, by treaties and statutes now give advance and general consent thereto.

[3] It is hardly necessary to say that a declaration of intent to change citizenship and allegiance has no present effect on either. When the change is effected, and only when effected, the rights and obligations of the person are shifted from the old country to the new, and not gradually or by piecemeal, but instantaneously and wholly. Those of the former end when those of the latter begin. The declaration is but expression of an intent, which for a variety of reasons may not be executed. For one illustration, by some federal examiner, or, rather, by some court yielding too much to the examiner, the alien may be refused admission, because he cannot pass an examination in constitutional law that 90 per cent. of the native-born would "flunk," and which well might drive the presiding judge to the books.

After the declaration, as before, the declarant is an alien. All this is fully recognized by this country in the act of 1907 (Comp. Stat. § 3958), providing that a declarant alien of three years' residence may have a passport to go abroad, but this country will not (as, of course, it lawfully cannot) protect him in the country of his citizenship and allegiance. In effect the declarant alien is notified of what is the law of nations, aside from said statute, that if here he violates his allegiance to his own country, say by entry into federal military service, and if on visiting his country it in resentment punishes him, this country neither will nor can intervene in his behalf. In the face of this, what sophistry and injustice to contend that a declarant alien is bound to render the supreme duty of citizenship, although he is denied the chief consideration for its performance!

[4] Adverting to the Naturalization Act, so far as necessary (Comp. Stat. § 4352), it requires that the alien shall (1) make a declaration of intention, (2) in open court prove that for five years immediately preceding "he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same," and (3) declare on oath "that he renounces" his foreign citizenship and allegiance then and there his, and that "he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same."

Despite the political status and obligations of aliens—and the word includes declarant aliens—and although the Naturalization Act does not expressly require as a condition to admission that the alien shall have entered military service, the argument is that his mere claim of exemption from the draft manifests he is not "attached to the principles of the Constitution"; that is, that the requirement of military service on demand is implied. Such implication is neither necessary

nor warranted. "Attached" in reference to principles, by all standard authorities, means "having regard and affection for" and "sustaining by moral force."

That this is the meaning of the word, as used in the Naturalization Act, seems obvious in the light of the law of nations, the political status of persons, and the other provisions of the act, all of which must be taken in account in proper interpretation. It is not reasonable to infer that Congress intended to compel or persuade aliens to enter federal military service, and thus to violate their allegiance, to offend their countries, and to invite foreign resentment against this country and the aliens. The inference does violence to the relations between citizens and their countries, to the good faith and fair dealing that must subsist between nations, and must be rejected.

So far as petitioner is concerned, at the time he claimed exemption he was a citizen of Norway, owing it allegiance, obligated to render military service to it alone. Both law and morals required that he should remain faithful to Norway until he shifted his allegiance and obligations from it to this country, upon admission to the latter's citizenship. Norway was neutral in the war and friendly to all combatants. At no time did Norway consent that its citizens could enter any combatant's military service.

For petitioner to acquiesce in draft into federal military service would be infidelity to and an offense against Norway—a poor recommendation to citizenship in this country. Unfaithfulness to Norway might be followed by unfaithfulness to this country. The better citizen to Norway, the better to this country. Of course it is not intimated that aliens in foreign military service are dishonorable men. Modern usage generally tolerates it, provided that, with that end in view, they avoid departing from their country, "not single spies, but in batallions." The only restriction upon this country's citizens is that they go singly, and not as an expedition, and avoid enlistment within this country. But this toleration does not extend to compulsory service, and in no wise changes the laws of nations and of this country, nor justifies the inference that voluntary military service by aliens is made a requirement of admission to citizenship by the word "attached" in the Naturalization Act.

To further repel the inference, the act clearly provides that only at admission to citizenship shall the alien on oath renounce his allegiance to his country, and assume allegiance to this country—to support and defend it thereafter. This inclusion of defense for the future excludes inference of defense in the past. See Luria v. U. S., 231 U. S. 23, 34 Sup. Ct. 10, 58 L. Ed. 101. Although petitioner was attached to, had affection for, the principles of the Constitution, his duty was to Norway; and between affection and duty, always, everywhere, in all circumstances, law and good morals dictate choice of duty. Upon the whole, when petitioner claimed exemption, he obeyed all law and violated none, performed his duty to both this country and Norway, conformed to good morals, and manifested that he was "attached to the principles of the Constitution."

It was the government that violated both law and morals, in subjecting him to the draft. And for it to contend that his mild insistence upon the right of exemption demonstrates unfitness for citizenship savors much of the tyrant's bitter complaint that his victims refused to die quietly and disturbed his sleep by their indecent wails of agony. That the Selective Draft Law (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k) subjected aliens declarant to draft does not militate against this conclusion. It was done against right, and foreign representations, remonstrances, and protests brought Congress to a realization of such untenable policy. It amended the act to conform to the law of nations, viz. that aliens would not be subjected to draft without their countries' consent; and it further provided that declarant aliens of neutral countries would not be subjected to draft without their consent. The latter's dissent was to appear by withdrawal of their declarations, and which would forever debar them from admission to citizenship. 40 Stat. 884 (Comp. St. Ann. Supp. 1919, §§ 2044¼a–2044¼c).

For reasons well understood and not commendable, great efforts were put forth to include as many aliens in the draft as possible. The vindication of their right to exclusion was made difficult as possible. Much curious "law" was written in consequence. It is within the power, but not the right, of Congress to subject aliens, declarant or otherwise, to compulsory military service, so far as courts are concerned. The policy is political, and in its exercise courts, the judicial branch of the government, cannot interfere, save to keep the executive branch from exceeding the limits set by Congress, the legislative branch.

[5] Another reason in support of the conclusion is that the government denied petitioner's claim of exemption, called him, in good faith he responded, and then it rejected him, because physically unfit. In these circumstances, to allow it to go back of that examination, and resort to the denied claim to bar his admission, would be to sanction bad faith, and is not tolerable. Despite the claim of exemption, he was deemed fit for the highest duty of citizenship, viz. military service, and by that same token he is fit for citizenship itself.

Still another reason is that the petitioner, his claim of exemption denied, did not hide nor take to the woods (not even the spruce woods), but presented himself for examination as an A 1 combatant and was rejected. Thereupon, in the copper mines, a vital and "key" industry, he rendered good service to this country. Great numbers of native-born had statutory or strategic exemption. The latter are the young and able-bodied, who by influence escaped into associations, organizations, and departments of more or less military tinge and little or no military hazard. So far from any particular reproach attending them, they now even assume leadership in civil life on the strength of their "military" record. Petitioner's service was as valuable and hazardous as many of these. No one condemns them. Why condemn him? Why demand more of the alien, who yet owes this country little, than of them, who now owe it much, everything? He ought to be deemed of

"good moral character and attached to the Constitution," even as they are. It is peculiar logic to hold otherwise.

Decree accordingly.

A final query, based on the principle of Tempel's Case, 248 U. S. 129, 39 Sup. Ct. 56, 63 L. Ed. 162: If government confiscates the services of mules admitted not its own, in a court of law, the owner may recover the reasonable value thereof, not being limited to compensation government may assume to pay; and if government confiscates the services of men admitted not its citizens, can they likewise recover?