*224 MEMORANDUM
LETTS, J.
I conclude that the motion of the defendants to dismiss plaintiff's bill as amended should be denied and I adopt as reasons for my conclusion the analysis of the law as found in the memorandum of Attorney General Jno. G. Sargent in the matter of the application of Paula Volkmann for Executive Allowance, a copy of which memorandum I find in the files of this case. Said Paula Volkmann was the sister of this claimant, and her claim was in all respects similar to that of her brother Richard M. Isenberg, the plaintiff herein.
DEPARTMENT OF JUSTICE
Washington
Application for Executive Allowance
And the return of property held by the Alien Property Custodian in behalf of Mrs. Paula Volkmann
Submitted with record by Alien Property Custodian for action by Attorney General and presented by Attorney General with opinion.
*225 Claimant: Paula Volkmann Claim No. 13712 DEPARTMENT OF JUSTICE November 8, 1926 THE WHITE HOUSE November 13, 1926 Allowed Calvin Coolidge Trust No. 12601 Property value: $415,000.00 Nature of claim: For return of certain securities and cash seized by the Alien Property Custodian as the property of the claimant. Recommendation of Alien Property Custodian: Favorable to allowance. Opinion of Attorney General: Favorable to allowance as the claimant was a woman who, prior to April 6, 1917, intermarried with a subject of Germany, being a citizen of the United States at the time of her marriage, and who did not acquire the property concerned from an enemy subsequent to January 1, 1917. Jno. G. Sargent, Attorney General.
My Dear Mr. President:
This claim is filed by Paula Volkmann for the return of certain securities, more particularly set forth in the notice of claim with accrued income and other cash in the sum of approximately $76,000. The total value of the claim is estimated by the Alien Property Custodian at approximately $415,000.00.
The claimant bases her right to the allowance of this claim on the ground that she was a woman, prior to April 6, 1917, intermarried with a subject of Germany, being a citizen of the United States at the time of her marriage, and that she did not acquire the property concerned from an “enemy” subsequent to January 1, 1917, and is accordingly, entitled to secure the return of such property under the provisions of Section 9(b) 3 of the Trading with the Enemy Act, as amended. (42 Stat. 1151.)
*226 The property claimed herein was reported to the Alien Property Custodian after the enactment of the Trading with the Enemy Act by H. Hackfeld & Company, Ltd., of Honolulu, Hawaii, as the property of the claimant, and the same was duly seized by the Custodian on February 27, 1918, in the name of said claimant and it is now held by the Alien Property Custodian and the Treasurer of the United States to her • credit. It appears that all of the property claimed herein was acquired by the claimant from her father, Paul Isenberg, who has been held to be an American citizen, prior to the war. No other person has ever asserted any claim against this property. Consequently, there is no question as to claimant’s ownership.
In proof of the fact that this claimant married a German subject prior to the war, there is submitted a certificate from the Chief Military Chaplain of the Garrison of Berlin, which shows that said claimant intermarried with one Johann Friedrich Christian Volkmann, Lieutenant of the Mounted Chasseurs Corps, on October 18, 1905, they being married in the Royal Garrison Church. The certificate states that the claimant was born in Bremen on April 7, 1883 and her husband in Bremen on November 30, 1874.
There are also submitted affidavits from the claimant and her mother, Beta Isenberg, in which they state that said claimant married Johann Friedrich Christian Volkmann, a German subject, on October 18, 1905.
The claimant’s ownership of the property, and her marriage prior to the war being established, the only remaining question is whether or not the claimant was an American citizen at the time of her marriage in 1905.
The claimant was born in the Free and Hanseatic City of Bremen, on April 7, 1883, while her parents, Paul and Beta Isenberg, were in that city. It is contended that the claimant’s father and mother were Hawaiian subjects at the time of her birth and that in view of such fact she acquired the Hawaiian nationality of her parents and retained the same until the *227 annexation of the Hawaiian Islands by the United States in 1898, at which time she acquired American citizenship by virtue of the Act of Congress of April 30, 1900, and that she retained such citizenship until the time of her marriage in 1905. It is, therefore, important to ascertain the citizenship status of the claimant’s father and mother at the time of her birth and up to the time of her marriage in 1905.
The property of Beta Isenberg, the mother of the claimant, was sequestered by the Alien Property Custodian during the war on the theory that she was an alien enemy. After the end of the war she brought a suit in the Supreme Court of the District of Columbia against the Alien Property Custodian and the Treasurer of the United States for the return of her sequestered property and based her right of recovery upon the ground that she was an American citizen and never an “enemy” under the Trading with the Enemy Act and thereby entitled to recover her property under the provisions of Section 9(a) of said Act, which permits recovery by such a person. She alleged in her bill that she was a citizen of the United States and a resident of the Territory of Hawaii; that she was married to Paul Isenberg in 1869, who had his permanent home in and was a resident of and domiciled in the Kingdom of Hawaii; that said Paul Isenberg was naturalized as a citizen of Hawaii in 1874; that she and her husband maintained their domicile in Hawaii 'until his death in 1903 and that she had since maintained her domicile there; that the business interests of her husband required him to travel frequently in Europe and that in 1884 he purchased a house in Bremen, Germany, which he maintained only for convenience when travelling in Europe and as a place of abode for his wife and children for the purpose of educating such children in Germany; that on April 12, 1899, while plaintiff’s husband, Paul Isenberg, was sojourning for a brief period in the Free and Hanseatic City of Bremen he was *228 granted privileges of citizenship in said city for himself, his wife and children; that the plaintiff left Germany after the war under a “personalausweis” and returned to Hawaii. (Isenberg v. Sutherland, et al., Eq. No. 43974, Supreme Court, D. C.) The Court overruled the motion to dismiss and in its opinion said in part as follows:
“It does not appear from the bill that Isenberg, his wife or children either sought to become citizens of the City of Bremen or assumed or promised to assume the duties of citizenship as distinguished from its privileges. The family home and apparently all the family properties were in the Hawaiian Islands and from the grant of mere privileges of citizenship, it can hardly be presumed that either Isenberg, his wife or children sought or were granted full citizenship. * * * He never renounced his citizenship in the Republic of Hawaii and he could not have done so without the consent of the Government to which he owed allegiance. McFarland v. Collector of Customs, 11 Haw. Rep. 166. The City of Bremen recognized that persons to whom it granted the privileges of citizenship had the right to retain the citizenship which they had prior to the grant, and the laws of Hawaii permitted its citizens to become citizens of other countries without losing their Hawaiian citizenship. The German government apparently did not regard the Isenberg family as German citizens inasmuch as the proper German authorities authorized to pass on claims to citizenship issued to Beta Isenberg, when she was about to leave Germany a personalausweis, a document usually accorded to persons who claimed citizenship in another country and who were not entitled to a German passport.
“Taking all these things into consideration, it would seem that the privileges of citizenship conferred on Isenberg, his wife and children was at best nothing more than an honorary citizenship which imposed no burdens and was of no more serious moment or effect than would have been the formal presentation and acceptance of the ‘keys of the city/
“Neither Germany nor any of its provinces or cities could nullify ex proprio motu the allegiance which Isenberg legally owed to Hawaii without acquiring the territory in which *229 Isenberg was actually domiciled. Isenberg could not by any act of his own cast off his allegiance unless Hawaii consented and Hawaii not only did not consent, but held him to his allegiance by express statute even if he acquired true citizenship in another country. The laws of Hawaii never authorized any citizen of Hawaii to expatriate himself and in the absence of such authority no citizen could voluntarily expatriate himself. Opinions of the Attorney General, of Hawaii, dated April 28, 1919, (No. 831). The court is therefore of the opinion that Paul Isenberg was a citizen of the Hawaiian Republic on the 12th of August, 1898 when the Islands were annexed to the United States. As he was a citizen of Hawaii on that date he became a citizen of the United States by virtue of the plain, unambiguous and unmistakable terms of the Act of Congress of April 30, 1900.
“As the laws of the United States then stood he could not without the consent of the Government of the United States divest himself of that citizenship and much less could he be divested of it by the City of Bremen. It is the common law of England and it is the law of this country that no citizen can by any act of his own and without the consent of his government put off his allegiance and become an alien. Ainslee v. Martin, 9 Mass. 254; Shanks v. Dupont, 3 Pet. 242, 245; McKenzie v. Hare, 239 U.S. 299, at p. 309. The weight of authority seems to be that a citizen cannot renounce his allegiance to the United States without the legislative permission of the Government and where there is no existing legislation or law to that effect the rule of the English common law remains unaltered. (Kents com. Vol. II, 49.)”
The court further held that the plaintiff has maintained her permanent home and domicile in Hawaii from the time of her marriage in 1869 and had retained her American citizenship. Thereafter the case was tried upon the merits in the Supreme Court of the District of Columbia and testimony was given by the plaintiff supporting the allegations contained in her bill, and documentary evidence was admitted showing the naturalization of Paul Isenberg as a subject of the Kingdom of Hawaii. Thereupon the Court held that the plaintiff was entitled to recover on the ground that she was an Amer *230 ican citizen. The Court in respect to the question of citizenship declared that it followed the decision of the court on the motion to dismiss. A decree was entered on February-20, 1926, directing the Alien Property Custodian and the Treasurer to return the plaintiff’s property to her, and this decree has been satisfied. The question, therefore, of the citizenship of the claimant’s father and mother is settled.
The claimant contends that she never took an oath of allegiance to Bremen or to Germany or any other foreign country, and made no application for citizenship in Germany or elsewhere, and always regarded herself as having the American citizenship of her parents after the annexation of Hawaii by the United States up until the time of her marriage in 1905.
Although born in Bremen, Germany, did the claimant acquire Hawaiian citizenship by birth by virtue of the Hawaiian citizenship of her father? The Kingdom of Hawaii had no specific statutory provision respecting the citizenship of children of citizens born in a foreign country. It is then necessary to consider the general provisions of the Hawaiian law existing at the time of the birth of this claimant and the decisions of the Hawaiian courts. Section 823 of the Civil Code of Hawaii of 1859 provided that:
“The several courts may cite and adopt the reasoning and principles of admiralty, maritime and common law of other countries and also of the Roman or Civil law so far as the same may be founded in justice and not in conflict with the laws and customs of this country.”
The Supreme Court of the District of Columbia in the case of Isenberg v. Hicks, supra, in discussing the above section of the Hawaiian civil code said:
“Those provisions simply left it with the courts to say whether they would adopt or reject the reasoning and analogies of the common law as their sense of justice and the laws and usages of the Kingdom might determine. Under *231 both provisions the courts of Hawaii were free to adopt and cite the common law or the Roman or Civil law, and that fact makes it evident that neither the common law nor the Roman or Civil law was made the law of the land. In fact in February, 1892, it was definitely decided by the court of last resort that the common law of England was not the law of the Kingdom. Thurston v. Allen, 8 How. 392 at 398-399. * * * Thurston v. Allen probably brought about the passage of Section 5 of Chapter 47 of the Sessions Laws of 1892, which reads as follows:
“ 'The common law of England, as ascertained by English and American decisions, is hereby declared to be the common law of the Hawaiian Islands in all cases, except as otherwise expressly provided by the Hawaiian Constitution or laws, or fixed by Hawaiian judicial precedent, or established by Hawaiian national usage.’ ”
It is a fundamental principle of the common law that all persons born within the dominions of the Crown, no matter whether of English or foreign parents are English subjects. See Cockburn on Nationality, 7; United States v. Wong Kim Ark, 169 U. S. 649; Dicey on Conflict of Laws, pp. 173, 177, 741.
The statute of 25 Edw. Ill, (1350) stated that the law of the crown of England is, and always hath been such, “that all children inheritors, which from henceforth shall be born without the ligeance of the King, whose fathers and mothers at the time of their birth be and shall be at the faith and ligeance of the King of England, shall have and enjoy the same benefits and advantages to have and bear the inheritance within the same ligeance, as the other inheritors aforesaid, in time to come: so always, that the mothers of such children do pass the sea by the license and wills of their husband.”
Some authorities support the view that this statute is merely declaratory of the common law, i.e., that a person born without the domain of British parents is a British subject. See Lynch v. Clarke, 1 Sandf. Ch. 583, 659, 660; Lud *232 lam v. Ludlam, 26 N. Y. 366; 2 Kent. Com. 50, 53. Dicey in his treatise on Conflict of Laws, p. 741, states that:
“The acquisition of nationality by descent, is foreign to the principles of the common law, and is based wholly upon statutory enactments.”
The latter view seems to be supported by the weight of authority, Binney on Allienigenae, 14, 20: Doe v. Jones, 4 T.R. 300; Sheddon v. Patrick, Macq. 535, 611; Cockburn on Nationality, 79.
By the Statute of 7 Anne, (1707) c. 5, sec. 3, it was provided that “the children of all natural-born subjects, born out of the ligeance of Her Majesty, her heirs, and successors, shall be deemed, adjusted and taken to be natural-born subjects of this Kingdom, to all intents, constructions and purposes whatsoever.”
The term “common law” has been held to include not only the customs and usages of the English people, but also the early statutes. In MacCauley v. Shurmann, 22 Haw. 140 at 144, the court quoted approvingly from Cowhick v. Shingle, 5 Wyc. 87, 95, as follows:
“As a rule the term 'common law’ means both the common law of England as opposed to the statute or written law and the statutes passed before the emigration of the first settlers of America”. See Patterson v. Winn, 5 Peters 240; Commonwealth v. Leach, 1 Mass. 61.
The early English cases held that a person born abroad of a British father shall take the nationality of his father. In Bacon v. Bacon, Cro. Car. 601, 79 English Reprint 1117, where the question was whether the daughter, who had been born abroad, of a British subject was an alien, the court said:
“Bramson, Berkeley and myself, after this had been argued at the bar, agreed that judgment should be given for the plaintiff, for her father being an English merchant and living beyond the seas for merchandizing, his daughter is born *233 a denizen and shall be heir to him; and it is not material though his wife be an alien.” See also Collingwood v. Pace, 1 Ventris, 423; De Geer v. Stone, 22 Ch. Div. 243.
In the case of Inglis v. Sailor’s Snug Harbour, 3 Pet. 99, the Supreme Court of the United States held that if a person was born in the United States in 1776 after the Declaration of Independence, of British parents, his nationality followed that of his father with the right of disaffirmance in a reasonable time after reaching his majority. The Court said, at page 126, that:
“If born after the 4th of July, 1776, and before the 15th of September of the same year, when the British took possession of New York, his infancy incapacitated him from making any election for himself, and his election and character followed that of his father, subject to the right of disaffirmance in a reasonable time after the termination of his minority; which never having been done, he remains a British subject, and disabled from inheriting the land in question.”
The status of children born abroad of American citizens was clearly settled by statute in the United States shortly after the formation of the Government under the Constitution. The Act of Congress of April 14, 1802, 2 Stat. 155, provided that:
“The children of persons who now are, or have been citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens of the United States; Provided, that the right of citizenship shall not descend to persons whose fathers have never resided within the United States.”
In the case of McFarland v. Collector of Customs, 11 Haw. 166, a question was in issue as to whether or not a person born in the Hawaiian Islands of British parents domiciled in the Islands was a Hawaiian subject. The court applied the doctrine of the courts of the United States and held that such a person was a Hawaiian subject by birth, notwithstanding the fact that he was registered at birth at the British Consu *234 late and had never renounced his allegiance to the British Crown. The Constitution of Hawaii was similar to the Fourteenth Amendment to the Constitution of the United States in that it provided that: “All persons born or naturalized in the Hawaiian Islands, and subject to the jurisdiction of the Republic, are citizens thereof.”
Therefore, at the time of the birth of this claimant there was no specific law of the Kingdom of Hawaii which declared that a child born abroad of a Hawaiian subject would be a Hawaiian, but the Civil Code of Hawaii of 1859 had authorized the courts to cite and adopt the reasoning and principles of admiralty, maritime and common law of other countries and also the Roman or Civil law so far as the same should be founded in justice and not in conflict with the laws and customs of the Islands. Under the Roman or Civil law a child born without the realm of a subject of the crown took the nationality of his father. This was also the rule of the common law as existing at the time of :the formation of this country; and the principle was adopted in the Act of Congress of April 14, 1802. The Civil Code of Hawaii of 1859 provided that every foreigner naturalized as a subject of Hawaii “shall be deemed to all intents and purposes a native of the Hawaiian Islands.” Consequently, the claimant’s father, who was naturalized as a subject of Hawaii prior to her birth, had all the rights and privileges of a native-born subject of the kingdom. Therefore, applying not only the Civil law, but the common law as recognized by the courts of this country and Hawaii, the nationality of the claimant undoubtedly followed that of her father.
Inasmuch as this claimant was born in Germany, it is important to consider whether or not she acquired German nationality by birth, it being shown that she never acquired such nationality by naturalization or other act on her part prior to her marriage in 1905. There is submitted a certificate from the German Embassy at Washington, D. C., to the effect *235 that according to the law of the North German Union of June 1, 1870, a child bom in Bremen, the place of the birth of this claimant, in 1883, whose father and mother were at the time of her birth citizens of the Kingdom of Hawaii, did not acquire the citizenship of Bremen or of Germany by reason of such fact, and that “according to that law German citizenship was only acquired by (being) the (legitimate) issue of a German father, through legitimation, by marriage, or through naturalization.”
This principle that a child born in Germany of a foreign father does not acquire German citizenship by birth, but takes the nationality of his father, is recognized as the law of Germany by Dr. Wilhelm Cohn of Berlin, Germany, in his treatise entitled, “Der Reichsgestez ueber die Erwerburg under den Ver lust der Reich — und Staatsugehoerigkeft, von 1. June 1870.” At page 29, he says:
“The child of a foreigner remains a foreigner, and the fact of birth in the country does not facilitate him in any way in the subsequent acquisition of citizenship therein.”
In Hall on International Law, 7th ed. at p. 235, it is stated that:
“In Germany, Austria, Hungary, Belgium, Denmark, Greece, Roumania, Servia, Sweden, Norway, Switzerland, Salvador, and Costa Rica, national character follows parentage alone, and all these states claim the children of their subjects as being themselves subjects, wherever they may be born.”
In the case of United States v. Wong Kim Ark, 169 U. S. 649, at p. 667, the court states:
“* * * the tendency on the Continent of Europe was to make parentage, rather than birthplace, the criterion of nationality, and citizenship was denied to the native-born children of foreign parents in Germany, Switzerland, Sweden and Norway.” * * *
It is, therefore, evident that this claimant did not acquire German citizenship by reason of her birth in Germany.
*236 Therefore, the only conclusions to be reached in the light of the foregoing authorities and the statutes of Hawaii, is that this claimant acquired the Hawaiian nationality of her father by birth, and as she retained such nationality up until the time of the annexation of the Islands by the United States, she acquired American citizenship by virtue of the Act of Congress of April 30, 1900, which provided that all persons who were citizens of the Republic of Hawaii were thereby declared to be citizens of the United States and of the Territory of Hawaii; and that she retained her American citizenship until her marriage in 1905.
The Department, therefore, finds that this claimant was a woman who, prior to April 6, 1917, intermarried with a subject of Germany, being a citizen of the United States at the time of her marriage, and who did not acquire the property claimed from an “enemy” subsequent to January 1, 1917, and is, accordingly, entitled to secure the return of her property under the provisions of subsection (b) 3 of Section 9 of the Trading with the Enemy Act, as amended.
It is, therefore, my recommendation that this claim be allowed.